**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BRETT MESSIEH, individually and on behalf of all
others similarly situated,

                        Plaintiff,

            v.

KAYDEX PTE. LTD., LOI LUU, VICTOR TRAN,
and YARON VELNER,

                        Defendants.

No. 1:20-cv-02812-RA

Honorable Ronnie Abrams

**JURY DEMANDED**

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ..................................................................................................1

II.  Parties................................................................................................................6

    A.   Plaintiff ..................................................................................................6

    B.   Defendants ..............................................................................................6

III. JURISDICTION AND VENUE ...........................................................................7

IV.  FACTUAL ALLEGATIONS ................................................................................8

    A.   The First Cryptocurrency: Bitcoin ........................................................8

    B.   Ethereum ...............................................................................................10

    C.   ERC-20 Tokens.....................................................................................11

    D.   The Advent Of The "ICO"....................................................................12

    E.   Kyber Network Solicited And Sold The KNC Token Through Both An
        ICO And Subsequent Sales On Crypto-Asset Exchanges .....................14

    F.   Investors Would Not Reasonably Have Understood Prior To April 3,
        2019, At The Earliest, That KNC Was A Security .................................25

    G.   The KNC Tokens Are Securities ..........................................................26

        1.   KNC Token Purchasers Invested Money...................................27

        2.   KNC Token Investors Participated In A Common Enterprise.................28

        3.   KNC Token Investors Purchased The Tokens With A Reasonable
            Expectation Of Profit From Owning Them ...............................29

        4.   Investors Expected Profits From The KNC Tokens To Be Derived
            From The Managerial Efforts Of Issuers ...................................32

    H.   The SEC Has Concluded That Tokens Such As KNC Are Securities.................37

    I.   The Class Has Suffered Significant Damages From Defendants' Actions...........38

V.   DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED
    PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM
    AT THE TIME THE EVENTS OCCURRED.................................................39

VI.    CLASS ALLEGATIONS ................................................................................42

VII.   CAUSES OF ACTION ..................................................................................45

FIRST CAUSE OF ACTION (SECURITIES ACT – PRIMARY LIABILITY) ..........................45

SECOND CAUSE OF ACTION (SECURITIES ACT – ADDITIONAL LIABILITY) .............46

THIRD CAUSE OF ACTION (ALABAMA STATE LAW – PRIMARY LIABILITY).............47

FOURTH CAUSE OF ACTION (ALABAMA STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................49

FIFTH CAUSE OF ACTION (ALASKA STATE LAW – PRIMARY LIABILITY).................50

SIXTH CAUSE OF ACTION (ALASKA STATE LAW – ADDITIONAL LIABILITY) ..........51

SEVENTH CAUSE OF ACTION (ARIZONA STATE LAW – PRIMARY LIABILITY).........53

EIGHTH CAUSE OF ACTION (ARIZONA STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................54

NINTH CAUSE OF ACTION (ARKANSAS STATE LAW – PRIMARY LIABILITY)...........56

TENTH CAUSE OF ACTION (ARKANSAS STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................57

ELEVENTH CAUSE OF ACTION (CALIFORNIA STATE LAW – PRIMARY
        LIABILITY) ........................................................................................58

TWELFTH CAUSE OF ACTION (CALIFORNIA STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................60

THIRTEENTH CAUSE OF ACTION (COLORADO STATE LAW – PRIMARY
        LIABILITY) ........................................................................................61

FOURTEENTH CAUSE OF ACTION (COLORADO STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................63

FIFTEENTH CAUSE OF ACTION (CONNECTICUT STATE LAW – PRIMARY
        LIABILITY) ........................................................................................64

SIXTEENTH CAUSE OF ACTION (CONNECTICUT STATE LAW – ADDITIONAL
        LIABILITY) ........................................................................................65

SEVENTEENTH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW –
        PRIMARY LIABILITY) ........................................................................67

EIGHTEENTH CAUSE OF ACTION (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)..............................................................................68

NINETEENTH CAUSE OF ACTION (FLORIDA STATE LAW – PRIMARY LIABILITY) ...............................................................................................70

TWENTIETH CAUSE OF ACTION (FLORIDA STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................71

TWENTY-FIRST CAUSE OF ACTION (GEORGIA STATE LAW – PRIMARY LIABILITY) ...............................................................................................72

TWENTY-SECOND CAUSE OF ACTION (GEORGIA STATE LAW – ADDITIONAL LIABILITY) ...............................................................................74

TWENTY-THIRD CAUSE OF ACTION (HAWAII STATE LAW – PRIMARY LIABILITY) ...............................................................................................75

TWENTY-FOURTH CAUSE OF ACTION (HAWAII STATE LAW – ADDITIONAL LIABILITY) ...............................................................................76

TWENTY-FIFTH CAUSE OF ACTION (IDAHO STATE LAW – PRIMARY LIABILITY) ...............................................................................................78

TWENTY-SIXTH CAUSE OF ACTION (IDAHO STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................79

TWENTY-SEVENTH CAUSE OF ACTION (ILLINOIS STATE LAW – PRIMARY LIABILITY) ...............................................................................................81

TWENTY-EIGHTH CAUSE OF ACTION (ILLINOIS STATE LAW – ADDITIONAL LIABILITY) ...............................................................................82

TWENTY-NINTH CAUSE OF ACTION (INDIANA STATE LAW – PRIMARY LIABILITY) ...............................................................................................84

THIRTIETH CAUSE OF ACTION (INDIANA STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................85

THIRTY-FIRST CAUSE OF ACTION (IOWA STATE LAW – PRIMARY LIABILITY) ...............................................................................................87

THIRTY-SECOND CAUSE OF ACTION (IOWA STATE LAW – ADDITIONAL LIABILITY) ...............................................................................................88

THIRTY-THIRD CAUSE OF ACTION (KANSAS STATE LAW – PRIMARY LIABILITY) ...............................................................................................90

THIRTY-FOURTH CAUSE OF ACTION (KANSAS STATE LAW – ADDITIONAL
        LIABILITY) ....................................................................................................... 91

THIRTY-FIFTH CAUSE OF ACTION (KENTUCKY STATE LAW – PRIMARY
        LIABILITY) ....................................................................................................... 93

THIRTY-SIXTH CAUSE OF ACTION (KENTUCKY STATE LAW – ADDITIONAL
        LIABILITY) ....................................................................................................... 94

THIRTY-SEVENTH CAUSE OF ACTION (LOUISIANA STATE LAW – PRIMARY
        LIABILITY) ....................................................................................................... 96

THIRTY-EIGHTH CAUSE OF ACTION (LOUISIANA STATE LAW – ADDITIONAL
        LIABILITY) ....................................................................................................... 97

THIRTY-NINTH CAUSE OF ACTION (MAINE STATE LAW – PRIMARY
        LIABILITY) ....................................................................................................... 99

FORTIETH CAUSE OF ACTION (MAINE STATE LAW – ADDITIONAL
        LIABILITY) ..................................................................................................... 100

FORTY-FIRST CAUSE OF ACTION (MARYLAND STATE LAW – PRIMARY
        LIABILITY) ..................................................................................................... 101

FORTY-SECOND CAUSE OF ACTION (MARYLAND STATE LAW –
        ADDITIONAL LIABILITY) ............................................................................. 103

FORTY-THIRD CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
        PRIMARY LIABILITY) ................................................................................... 104

FORTY-FOURTH CAUSE OF ACTION (MASSACHUSETTS STATE LAW –
        ADDITIONAL LIABILITY) ............................................................................. 106

FORTY-FIFTH CAUSE OF ACTION (MICHIGAN STATE LAW – PRIMARY
        LIABILITY) ..................................................................................................... 107

FORTY-SIXTH CAUSE OF ACTION (MICHIGAN STATE LAW – ADDITIONAL
        LIABILITY) ..................................................................................................... 108

FORTY-SEVENTH CAUSE OF ACTION (MINNESOTA STATE LAW – PRIMARY
        LIABILITY) ..................................................................................................... 110

FORTY-EIGHTH CAUSE OF ACTION (MINNESOTA STATE LAW – ADDITIONAL
        LIABILITY) ..................................................................................................... 111

FORTY-NINTH CAUSE OF ACTION (MISSISSIPPI STATE LAW – PRIMARY
        LIABILITY) ..................................................................................................... 113

FIFTIETH CAUSE OF ACTION (MISSISSIPPI STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................114

FIFTY-FIRST CAUSE OF ACTION (MISSOURI STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................115

FIFTY-SECOND CAUSE OF ACTION (MISSOURI STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................117

FIFTY-THIRD CAUSE OF ACTION (MONTANA STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................118

FIFTY-FOURTH CAUSE OF ACTION (MONTANA STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................120

FIFTY-FIFTH CAUSE OF ACTION (NEBRASKA STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................121

FIFTY-SIXTH CAUSE OF ACTION (NEBRASKA STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................122

FIFTY-SEVENTH CAUSE OF ACTION (NEVADA STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................124

FIFTY-EIGHTH CAUSE OF ACTION (NEVADA STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................125

FIFTY-NINTH CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................127

SIXTIETH CAUSE OF ACTION (NEW HAMPSHIRE STATE LAW – ADDITIONAL
    LIABILITY) ...................................................................................................128

SIXTY-FIRST CAUSE OF ACTION (NEW JERSEY STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................130

SIXTY-SECOND CAUSE OF ACTION (NEW JERSEY STATE LAW –
    ADDITIONAL LIABILITY)...........................................................................131

SIXTY-THIRD CAUSE OF ACTION (NEW MEXICO STATE LAW – PRIMARY
    LIABILITY) ...................................................................................................133

SIXTY-FOURTH CAUSE OF ACTION (NEW MEXICO STATE LAW –
    ADDITIONAL LIABILITY)...........................................................................134

SIXTY-FIFTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW –
    PRIMARY LIABILITY) .................................................................................136

SIXTY-SIXTH CAUSE OF ACTION (NORTH CAROLINA STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 137

SIXTY-SEVENTH CAUSE OF ACTION (NORTH DAKOTA STATE LAW –
PRIMARY LIABILITY) .............................................................................................. 138

SIXTY-EIGHTH CAUSE OF ACTION (NORTH DAKOTA STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 140

SIXTY-NINTH CAUSE OF ACTION (OHIO STATE LAW – PRIMARY LIABILITY) ....... 141

SEVENTIETH CAUSE OF ACTION (OHIO STATE LAW – ADDITIONAL
LIABILITY) ................................................................................................................. 142

SEVENTY-FIRST CAUSE OF ACTION (OKLAHOMA STATE LAW – PRIMARY
LIABILITY) ................................................................................................................. 144

SEVENTY-SECOND CAUSE OF ACTION (OKLAHOMA  STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 145

SEVENTY-THIRD CAUSE OF ACTION (OREGON STATE LAW – PRIMARY
LIABILITY) ................................................................................................................. 146

SEVENTY-FOURTH CAUSE OF ACTION (OREGON STATE LAW – ADDITIONAL
LIABILITY) ................................................................................................................. 148

SEVENTY-FIFTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW –
PRIMARY LIABILITY) .............................................................................................. 149

SEVENTY-SIXTH CAUSE OF ACTION (PENNSYLVANIA STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 150

SEVENTY-SEVENTH CAUSE OF ACTION (PUERTO RICO STATE LAW –
PRIMARY LIABILITY) .............................................................................................. 152

SEVENTY-EIGHTH CAUSE OF ACTION (PUERTO RICO STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 153

SEVENTY-NINTH CAUSE OF ACTION (RHODE ISLAND STATE LAW –
PRIMARY LIABILITY) .............................................................................................. 155

EIGHTIETH CAUSE OF ACTION (RHODE ISLAND STATE LAW – ADDITIONAL
LIABILITY) ................................................................................................................. 156

EIGHTY-FIRST CAUSE OF ACTION (SOUTH CAROLINA STATE LAW –
PRIMARY LIABILITY) .............................................................................................. 158

EIGHTY-SECOND CAUSE OF ACTION (SOUTH CAROLINA STATE LAW –
ADDITIONAL LIABILITY) ......................................................................................... 159

EIGHTY-THIRD CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY) ...............................................................................160

EIGHTY-FOURTH CAUSE OF ACTION (SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)...........................................................................162

EIGHTY-FIFTH CAUSE OF ACTION (TENNESSEE STATE LAW – PRIMARY LIABILITY) ...............................................................................163

EIGHTY-SIXTH CAUSE OF ACTION (TENNESSEE STATE LAW – ADDITIONAL LIABILITY) ...............................................................................164

EIGHTY-SEVENTH CAUSE OF ACTION (TEXAS STATE LAW – PRIMARY LIABILITY) ...............................................................................166

EIGHTY-EIGHTH CAUSE OF ACTION (TEXAS STATE LAW – ADDITIONAL LIABILITY) ...............................................................................167

EIGHTY-NINTH CAUSE OF ACTION (UTAH STATE LAW – PRIMARY LIABILITY) ...............................................................................169

NINETIETH CAUSE OF ACTION (UTAH STATE LAW – ADDITIONAL LIABILITY) ...............................................................................170

NINETY-FIRST CAUSE OF ACTION (VERMONT STATE LAW – PRIMARY LIABILITY) ...............................................................................172

NINETY-SECOND CAUSE OF ACTION (VERMONT STATE LAW – ADDITIONAL LIABILITY) ...............................................................................173

NINETY-THIRD CAUSE OF ACTION (VIRGINIA STATE LAW – PRIMARY LIABILITY) ...............................................................................174

NINETY-FOURTH CAUSE OF ACTION (VIRGINIA STATE LAW – ADDITIONAL LIABILITY) ...............................................................................176

NINETY-FIFTH CAUSE OF ACTION (WASHINGTON STATE LAW – PRIMARY LIABILITY) ...............................................................................177

NINETY-SIXTH CAUSE OF ACTION (WASHINGTON STATE LAW – ADDITIONAL LIABILITY)...........................................................................178

NINETY-SEVENTH CAUSE OF ACTION (WISCONSIN STATE LAW – PRIMARY LIABILITY) ...............................................................................180

NINETY-EIGHTH CAUSE OF ACTION (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)...........................................................................181

NINETY-NINTH CAUSE OF ACTION (WEST VIRGINIA STATE LAW – PRIMARY
        LIABILITY) ...................................................................................................183

ONE HUNDREDTH CAUSE OF ACTION (WEST VIRGINIA STATE LAW –
        ADDITIONAL LIABILITY)...........................................................................184

ONE HUNDRED AND FIRST CAUSE OF ACTION (WYOMING STATE LAW –
        PRIMARY LIABILITY) ................................................................................186

ONE HUNDRED AND SECOND CAUSE OF ACTION (WYOMING STATE LAW –
        ADDITIONAL LIABILITY)...........................................................................187

PRAYER FOR RELIEF ......................................................................................188

JURY TRIAL....................................................................................................189

Plaintiff Brett Messieh, individually and on behalf of all others similarly situated, brings this action against Defendants KayDex Pte. Ltd. ("Kyber" or "Kyber Network"), Loi Luu, Victor Tran, and Yaron Velner (the "Individual Defendants," and together with Kyber Network, "Defendants").  Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of relevant whitepapers, press releases, media reports, and other publicly disclosed reports and information about Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.  Plaintiff hereby alleges as follows:

## I.    INTRODUCTION

1.    Within the Class Period, which is from September 15, 2017 through the present, Defendants promoted, offered, and sold Kyber Network's securities, called Kyber Network Crystal (KNC) tokens, in violation of federal and state securities laws.  Plaintiff, individually and on behalf of investors who purchased KNC tokens in domestic U.S. transactions (the "Class"), brings claims to recover the consideration paid for the KNC tokens, together with interest thereon, as well as attorneys' fees and costs.

2.    A digital token is a type of digital asset that exists on a "blockchain," which is essentially a decentralized digital ledger that records transactions; these blockchain-dependent assets are sometimes referred to as "crypto-assets."  Various types of crypto-assets can reside on blockchains, including crypto-assets such as Bitcoin and Ethereum, which are decentralized digital commodities.  There are also "smart contracts" that operate under a set of predetermined conditions agreed to by users.  With smart contracts, the terms of the contract are automatically carried out

by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

3.     Certain of these digital tokens are classified as "utility tokens" and are associated with particular projects.  Their primary purpose is to allow the holder to use or access the associated project.  For example, one private-jet company has adopted a business model based on issuing utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

4.     Other tokens are more speculative, are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens.  Although these tokens derive their value from the startup behind the project, they are unlike traditional securities in that they do not give the holder ownership in any corporate entity.  Rather, investors purchase these tokens with the hope that their value will increase in the future as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these tokens, including Kyber Network, were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC").  Kyber Network, however, failed to do so.  By selling these unregistered tokens to investors, Kyber Network reaped millions of dollars in profits.

5.     The scheme worked as follows:  First, Kyber Network issued a "whitepaper" to investors that purported to describe in highly technical terms Kyber Network's protocol's supposed utility to which KNC would be placed.  The Kyber Network whitepaper also omitted the disclosures that securities laws and the SEC have long deemed essential to investor protections in

initial public offerings, including use of "plain English" to describe the offering; a list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; and a standardized format that investors could readily follow.   Without these critical disclosures, investors in KNC tokens were thus left to fend for themselves—precisely the opposite of what the securities laws require.

6.      Although KNC was a security, Kyber Network did not register it as a security with the SEC and did not qualify for an exemption from registration requirements.

7.      Kyber Network first sold the KNC tokens to investors through an "initial coin offering" (or "ICO").  Kyber Network kept nearly 40 percent of the KNC tokens for itself and solicited online exchanges of digital assets (known as cryptocurrency or crypto-asset exchanges) to list KNC tokens on their platforms and encourage purchases by a wide universe of investors.

8.      Kyber Network's solicitation did not stop at the ICO.  Instead, in order to maximize the value of the KNC tokens it maintained and to further its financial position generally, Kyber Network continued to promote the KNC token both on its website and on social media.  These promotions included marketing tactics specifically designed to appeal to less sophisticated consumers, such as a telegram "sticker contest," video competitions, prize giveaway of tokens if users subscribed to Kyber Network's subreddit account, and a contest asking a user to "turn  any of the 70+ tokens on Kyber into your fav food" using a creative food design image or picture.

9.      Kyber Network promoted, offered, and sold KNC through generalized solicitations using statements posted on the Internet and distributed throughout the United States and worldwide, such that Kyber Network offered and sold the securities to Plaintiff and the general public in domestic U.S. transactions.  Kyber Network's efforts at marketing itself in the United

States included expending capital to list KNC on U.S. exchanges and promotions and marketing focused on prospective purchasers in the United States.

10.     During the ICO and throughout Kyber Network's subsequent solicitation of KNC, Kyber Network did not disclose that KNC was a security.  In fact, the Kyber Network whitepaper instead likened KNC to bitcoin and ether and expressly stated that its protocol that relied on the KNC token would allow "instant exchange and conversion of digital assets (e.g. crypto tokens) and cryptocurrencies (e.g. Ether, Bitcoin, ZCash) with high liquidity." The whitepaper repeatedly made similar statements that misleadingly suggested KNC was like bitcoin and ether, and emphasized the relevance of the platform for cryptocurrencies like bitcoin and ether.  For example, it promised that "[d]erivatives will be introduced to mitigate the exposure to the risk of volatilities for the users of KyberNetwork Crystals (KNC) and selected cryptocurrencies."  In addition, Kyber Network further conveyed to investors at issuance that KNC was not a security, by failing to file a registration statement for it with the SEC.

11.     It was not clear to a reasonable investor at purchase that KNC tokens were, contrary to Kyber Network's representations, securities.  That the KNC tokens were securities would not have been reasonably apparent until, at the earliest, April 3, 2019, when the SEC released a detailed "Framework" to analyze digital assets, indicating that KNC and other similar digital tokens are "investment contracts" and therefore securities under Section 2 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1).[1]  Prior to that time, based on statements of Kyber Network and the SEC, a reasonable investor would not have concluded that such tokens were securities under federal and state law.  But KNC *was* a security under the applicable SEC

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

Framework.  Kyber Network thus engaged in transactions that consisted of the solicitation, offer, and sale of securities without registering them as federal and state laws require for the protection of investors.

12.     KNC's status as a security has been confirmed by recent regulatory action by the SEC.  On September 30, 2019, nearly six months after releasing its Framework, the SEC found that another major issuer of digital tokens, Block.one, which had issued a token called EOS between June 2017 and June 2018, had likewise violated the Securities Act by selling unregistered securities to the public.  The EOS token was functionally identical to KNC—both tokens were not described as securities to investors, but are securities under the SEC's April 2019 Framework.  As a result of an SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS is a security applies with equal force to KNC.

13.     Plaintiff and the Class are entitled to recover the consideration they paid for the KNC tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase.

14.     In addition, numerous Class members resided, and were present when they traded in KNC tokens, in States or territories with their own "Blue Sky" protections for investors.[3]  Under

---

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Blue Sky statutes typically define "securities" to include "investment contracts," which has been interpreted by State courts commensurate with the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

these laws, investors in these jurisdictions who purchased unregistered KNC securities are entitled to rescission, and generally interest thereon, attorneys' fees, and costs.

15.     Accordingly, individually and on behalf of the Class, Plaintiff brings claims to recover the consideration paid for the KNC tokens, together with interest thereon, as well as attorneys' fees and costs.

## II.   Parties

### A.     Plaintiff

16.     Plaintiff Brett Messieh is a resident of Tampa, Florida.  Messieh and members of the Class purchased KNC, an unregistered security, from Florida during the Class Period. A true and correct copy Messieh's KNC transactions is included in Exhibit A.

### B.     Defendants

17.     Defendant Kyber Network is an entity formed under the laws of Singapore as KayDex Pte. Ltd.  On information and belief, Kyber Network has an office in Singapore.  Kyber Network is a blockchain-focused software-development company that describes itself as an "on-chain liquidity protocol that aggregates liquidity from a wide range of reserves, powering instant and secure token exchange in any decentralized application."

18.     Defendant Loi Luu is a co-founder and the CEO of Kyber Network.  On information and belief, he resides in Singapore.

19.     Defendant Victor Tran is a co-founder and the Chief Technology Officer ("CTO") of Kyber Network.  On information and belief, he resides in Vietnam.

20.     Defendant Yaron Velner is a co-founder and the former CTO of Kyber Network. On information and belief, he resides in Israel.

## III.    JURISDICTION AND VENUE

21.    Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state.

22.    Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the Amended Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

23.    This Court has jurisdiction over violations of State Blue Sky statutes pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

24.    This Court has personal jurisdiction over Defendants.  Defendants purposefully availed themselves of the privilege of conducting activities in the United States in connection with their offer or sale of unregistered securities, including activities occurring in or aimed at the State of New York, by maintaining an interactive commercial website accessible and used by U.S. investors, by marketing in the United States and New York to those investors, and by employing agents, employees, and/or vendors in the United States and New York.  For example, Luu was a featured speaker at the Fluidity 2019 Summit in New York City.  Defendants engaged in conduct that had a foreseeable substantial effect in the United States connected with those offers and sales. Defendants also transacted business within New York pursuant to N.Y. C.P.L.R. 302(a)(1).

25.    Venue is proper pursuant to 15 U.S.C. § 77v (a) in that this is a district wherein one or more defendants is found or transacts business or where the offer or sale of KNC tokens took

place.  In May 2019, Kyber Network was represented at a New York City cryptocurrency meetup hosted by Fabr(x).

## IV.    FACTUAL ALLEGATIONS

### A.    The First Cryptocurrency: Bitcoin

26.    A crypto-asset is a digital asset designed to work as a medium of exchange or a store of value or both.  Crypto-assets leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

27.    Bitcoin was the world's first decentralized crypto-asset.  It is also the largest and most popular crypto-asset, with a market capitalization of approximately 190 billion.  Bitcoin spawned a market of other crypto-assets that, together with Bitcoin, have a current market capitalization of $334 billion. (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

28.    At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

29.    Blockchains act as the central technical commonality across most crypto-assets. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

30.    Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources,

which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

31.     Mining is one method by which an individual can acquire crypto-assets like Bitcoin. A second and more common manner is to obtain crypto-assets from someone else.  This is often accomplished by acquiring it through an online "crypto-asset exchange."

32.     Online crypto-asset exchanges are one place to purchase Bitcoin and other crypto-assets.  These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

33.     In April 2013, there were only seven crypto-asset listed on coinmartketcap.com, a popular website that tracks the crypto-asset markets.  As of this filing, the site monitors more than 6,600 cryptocurrencies.

34.     For a time, Bitcoin was the only crypto-asset available on exchanges.  As crypto-assets grew in popularity, exchanges began listing other crypto-asset as well and trading volumes expanded.  In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

35.     Bitcoin is a commodity, rather than a security, because it allows for quick and secure transactions, can serve as a long-term store of value, and is decentralized from any government or private control. There is no "Bitcoin Inc." that has the ability to cause the price of bitcoin to rise through careful management or fall through mismanagement or deception.  Instead, Bitcoin's value is purely a response to market-wide forces, and a customer buying a bitcoin is not

investing in a common enterprise.  Both the CFTC and courts have accordingly recognized that Bitcoin is appropriately classified as a commodity.

**B.    Ethereum**

36.    Ethereum is the second-most popular crypto-asset, with a market capitalization of approximately $41 billion.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem"—that is, the overall network of individuals using Ethereum or participating in the development of its network.)  Ethereum, like Bitcoin, is a commodity rather than a security.

37.    Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.  A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

38.    As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

39.    A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

40.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

41.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

### C.     ERC-20 Tokens

42.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain, known as "ERC-20 tokens."

43.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than crypto-assets like Bitcoin and Ethereum because they do not operate on an independent blockchain.

44.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable, such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 token transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

45.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

### D.    The Advent Of The "ICO"

46.    Between 2014 and 2016, Bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

47.    By the end of 2016, interest in crypto-asset began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more dynamic.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

48.    Seeking to capitalize on the growing enthusiasm for crypto-assets, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the KNC tokens.  Many of these issuers, improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in KNC, were denied access to important information before making their investment decision.

49.    In August 2017, Kyber Network announced dates for the ICO and began soliciting investors by encouraging them to join its Slack community with promises to whitelist them, *i.e.*, guarantee them an opportunity to purchase tokens in the ICO.  The initial offering ended on September 16, 2017, raising approximately $52 million.

50.    Investors would explore the various cryptocurrency exchanges and social media sites that published active and upcoming ICOs.  Many of these postings encouraged trading in KNC for profit.

51.     Between 2017 and 2018, nearly $20 billion was raised through ICOs.  None of these ICOs were registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.  In the months leading up to Kyber Network's ICO, for example, issuers such as Block.one, Bancor, and Status had each raised at least *one hundred million dollars* from selling their ERC-20 tokens through ICOs.

52.     Like most ICOs, ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers, including Kyber Network, typically released a "whitepaper" describing the project and terms of the ICO.  These whitepapers advertised the sale of tokens or coins through the ICO.  They typically advertised the creation of a "new blockchain architecture." In the case of KNC, Kyber Network released the first version of its whitepaper in May 2017.

53.     The whitepapers typically contained vastly less information than a registration statement filed with the SEC would have included.  For example, whitepapers did not include a "plain English" description of the offering; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; an explanation of how the proceeds from the offering would be used; or a standardized format that investors could readily follow.

54.     When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer.  In almost all cases, these tokens could also be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

55.     These tokens were frequently listed on crypto-asset exchanges, where they were bought and sold using other crypto-assets (such as Bitcoin or Ethereum) or traditional currencies such as the U.S. dollar.

56.     Even after an ICO, an issuer could receive a direct financial benefit from high prices in their token tokens by selling them to customers on these exchanges. These subsequent offerings were not registered or flagged to customers; instead, they most often relied on the same whitepapers that had accompanied the sale of the tokens in the ICO, as well as continuing marketing efforts from the issuers seeking to increase the price of the tokens.

**E.     Kyber Network Solicited And Sold The KNC Token Through Both An ICO And Subsequent Sales On Crypto-Asset Exchanges**

57.     In May 2017, as noted, Kyber Network published the first version of the "KyberNetwork whitepaper."  The final version of the whitepaper cast the KyberNetwork as "the first system that implements several ideal operating properties of an exchange."  It described how the KyberNetwork protocol would create the only "on chain" decentralized exchange boasting instant trade execution, low costs, and guaranteed liquidity.

### 3.5. Comparison to existing systems

We compare KyberNetwork to existing systems in the table below. We left out Bancor intentionally as they claim (from our private conversation) to be a platform that focus on community tokens, rather than general purpose exchange.

| Exchange | Trading Cost [7] | Trustless | Instant Trades | On-chain | Guaranteed Liquidity | SecureAgainst Attacks |
|---|---|---|---|---|---|---|
| Kraken/Poloniex | Low | No | No | No | Yes | No |
| Shapeshift | Low | No | Yes | No | Yes | No |
| Coinbase | Low | No | Yes | No | Yes | No |
| EtherDelta Oasis Index | High | Yes | No | Yes | No | Yes |
| Swap.tech 0xProject | Low Low | Somewh-at[8] | No | Hybrid | No | Not sure[9] |
| **KyberNetwork** | Low | Yes | Yes | Yes | Yes | Yes |

58.     The whitepaper also specified that to operate the exchange, "KyberNetwork reserves" would need to "pre-purchase and store KyberNetwork Crystal (KNC) tokens."  With every trade, a small percentage of the reserves would be burned.[4]  The whitepaper was explicit about the implications of this last point, explaining that "[t]he burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces."

59.     Besides underpinning the reserve system, the whitepaper also envisioned KNC being used to "to reward various parties who will help generate more trading activities in the platform" by paying them "in KNC for every trade that they introduce to KyberNetwork."

60.     Kyber Network launched the KNC token by utilizing the ERC-20 protocol.  At launch, Kyber Network created 226 million tokens.

61.     Kyber Network retained 19.47 percent of the tokens for itself and an additional 19.47 percent for its founders, advisors, and early investors.

62.     The remaining tokens were sold during KNC's ICO, which Kyber Network organized and ran, raising approximately $52 million in proceeds.

63.     Approximately one week before KNC's ICO, its "whitelist" of users who sought to participate was fully subscribed, and the website Crush Crypto touted that the ICO had both "short- and long-term potential."  Crush Crypto also observed that since "the value of KNC tokens hinges on how much profit KyberNetwork can generate, the more volume and profit the network generates, the more valuable KNC tokens should be."  One commenter on a related Crush Crypto video review of KNC's ICO validated the perceived long-term investment value of KNC: "Holding KNC for sure, so happy I managed to get in on this early. Been waiting for this ICO."

---

[4] "Burning" is a mechanism that permanently removes the token from circulation and is recognized by the Framework as a method to increase scarcity artificially.

Another commenter stated, "[I] see a double money return after the first day it comes to market." And Luu, in an effort to promote and generate excitement over the upcoming ICO, tweeted about the success of the "whitelist" due to registration overflow.

 **Loi Luu** @loi_luu

RT @crypto_ninjas: @KyberNetwork closes #ICO whitelist early due to registration overflow @loi_luu #cryptocurrency | https://t.co/32dsHqkCeJ https://t.co/Stw7HVUN9w 📷

♡ 0    ⟲ 0    🐦 Twitter Web Client   🕒 Aug 20, 2017 09:13:30   ↗

64.     Fueling this public frenzy before the ICO, Kyber Network announced that it was taking additional measures because it had "one of the busiest and largest blockchain and cryptocurrencies Slack communities globally."  It also publicized on Twitter that it was delighted its whitelist had "receive[d] such massive support."  Luu additionally alerted the public that Kyber Network's "Slack channel has grown so much and is testing Slack's limit.  As such, we are now bounded by technical limitation and would have to request non-members to participate in the whitelist via our Telegram group."

65.     Part of the reason for the unprecedented excitement and interest in the KNC ICO was the fact that Vitalik Buterin, the popular founder of Ethereum, was a well-publicized advisor to Kyber Network.

66.     Kyber Network specifically directed its promotion and advertisement of its platform and KNC tokens in the United States, as well as worldwide.  For example, Kyber Network has an interactive exchange website accessible to U.S. users which uses English as the default language and uses U.S. dollars as the default currency.  Kyber Network users can utilize websites operated by Kyber Network to exchange tokens, including KNC tokens, for other tokens.  Kyber Network also posts articles and tutorials—in English—aimed at beginners regarding managing crypto-assets and using KNC.



67.    Just days after the ICO had concluded, Kyber Network continued to promote and advertise KNC in the United States to encourage trading on exchanges like Binance that had listed the token for trading on secondary markets.



68.    Throughout the Class Period, KNC was available for sale on dozens of different exchanges. This includes exchanges that were incorporated or headquartered in the United States and that targeted and welcomed U.S. traders, including Poloniex, Kraken, Coinbase, and Gate.io.

69.     Throughout the Class Period, Kyber Network and the Individual Defendants solicited the sale of KNC in order to serve their own financial interests.  Because the Defendants continued to possess many KNC tokens themselves, Defendants could profit directly from high KNC prices by selling the KNC they held on crypto-asset exchanges. They achieved these high prices through continuous systematic marketing of the KNC tokens, including the publication of information designed to make the KNC tokens appear to be favorable investments.  For example, in April 2019, when the price of KNC had sunk to under $0.30 per token (well below its peak price of over $5), Kyber Network released an updated whitepaper with an entire new section devoted to "KNC Usage" and promising new "economic, governance and treasury functionalities" for the token.  In a blogpost previewing this whitepaper, Kyber Network explained its hope that "[b]y getting KNC into the hands of contributors, and giving them an economic interest in the success of the platform, we will chart the way forward towards a sustainable, decentralized system and community."

70.     Kyber Network's website served as a continuous form of solicitation throughout the Class Period that both promoted and enabled sales of KNC.  Kyber Network's website has also included links to exchanges where individuals can purchase KNC tokens.

71.     The sale agreement for Kyber Network's ICO represented that 15 percent of KNC would be reserved for founders and advisors, but would "be fully vested in 2 years, with a one year lock-up period."  It would have been simple for Kyber Network to code these vesting and lockup commitments into the KNC smart contract, as this is precisely the sort of agreement that ERC-20 tokens were designed to facilitate.  That would have guaranteed that Kyber Network and the Individual Defendants were unable to sell the "founder" KNC on any secondary markets until the end of the vesting and lockup periods.

72.     Yet Kyber Network and the Individual Defendants chose not to include any vesting or lockup commitments in the code for the KNC smart contract, which meant that there were no technical limitations on their ability to resell their founder tokens immediately after the ICO when KNC became listed on various exchanges.

73.     Throughout the Class Period, Kyber Network and the Individual Defendants continued to promote sales of KNC on various exchanges, such as Huobi, via social media:



74.     And just two months after the ICO, Kyber Network continued to promote itself and KNC when it announced a strategic partnership with a blockchain organization affiliated with the University of California, Berkeley.  Luu tweeted his excitement:



75.     Kyber Network specifically directed its promotion and advertisement of KNC and Kyber Network to the United States.  For example, in December 2017, Luu promoted his upcoming

presentations at a "Silicon Valley Ethereum Developers" meeting and a "Silicon Valley Ethereum Meetup" in Santa Clara, California, tweeting: "if you stay around Sillicon [sic] Valley, our cofounder @loi_luu will be presenting at two meetups on Dec 4."

76.     In May 2019, Luu was a featured speaker at the Fluidity 2019 Summit in New York City, and in the same month, Kyber Network was represented at a New York City crypto-asset meetup hosted by Fabr(x).



77.     Furthermore, in 2020, two "Kyber Network ambassadors" attended and delivered a presentation at an Ethereum conference in Denver, Colorado.  Kyber Network tweeted a photo of the "ambassadors" bragging that "Kyber was at @EthereumDenver, where we shared about our Katalyst upgrade to hundreds of attendees."

78.     Kyber Network also promoted its token-burning program, which sought to make KNC tokens an attractive investment.  For example, shortly after the ICO, Kyber Network announced that it had completed two token-burn transactions that burned over 10 million tokens:



79.     Kyber Network would continue to advertise its token-burn transactions, including in Luu's tweets of April 17, 2019, and as recently as June 18, 2020, where he announced that Kyber Network had "just hit the 5M KNC burned milestone."



80.     Defendants also engaged in steps necessary to the distribution of KNC throughout the Class Period by promoting KNC tokens on social media. The below are just some of the many instances spanning the Class Period in which Defendants promoted and solicited KNC, including ones that attempted to court customers by creating promotions and contests:

- December 5, 2017:



- March 5, 2018:





- April 27, 2018:



- February 4, 2019:



Kyber Network
@KyberNetwork

#LunarNewYear is best celebrated with lots of yummy food 🍎 🍕 🍜 Turn any of the 70+ tokens on Kyber into your fav food for a chance to win up to $200 in tokens!

To Win
. Retweet with your creative token food design/pic
. Tag @KyberNetwork #KyberNewYear
Contest ends 13 Feb 11pm



8:24 AM · Feb 4, 2019 · Twitter for iPhone

83 Retweets and comments    109 Likes

- February 14, 2020:





### F.   Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That KNC Was A Security

81.   Prior to April 3, 2019, when the SEC released its Framework, it was unclear to a reasonable investor that KNC was a security.  On June 14, 2018, for example, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly opined that not "all ICOs must be deemed securities offerings."  Commissioner Peirce identified numerous open questions that issuers like KNC emphasized when arguing that ERC-20 tokens are not securities, such as the utility of the KNC token in an incomplete or partially complete network.

25

82.     Other thought leaders in the space, such as the registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

G.     **The KNC Tokens Are Securities**

83.     KNC tokens are securities because they constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. At issuance, as described above, it was not clear to a reasonable purchaser that the KNC tokens were securities as defined under federal and state securities laws.

84.     Within the last year prior to the filing of the initial Complaint in this action, however, the SEC has clarified, pursuant to its statutorily delegated authority, and with the benefit of labor-intensive research and investigations, that many ERC-20 tokens, including KNC, were securities.  On April 3, 2019, as noted above, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."  Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset, like KNC, is a security.  Under application of the Framework, the KNC tokens were securities at issuance.

85.     In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law
> have found that an "investment contract" exists when there is the
> investment of money in a common enterprise with a reasonable
> expectation of profits to be derived from the efforts of others. The
> so-called "*Howey* test" applies to any contract, scheme, or
> transaction, regardless of whether it has any of the characteristics of
> typical securities. The focus of the *Howey* analysis is not only on the
> form and terms of the instrument itself (in this case, the digital asset)
> but also on the circumstances surrounding the digital asset and the
> manner in which it is offered, sold, or resold (which includes
> secondary market sales). Therefore, issuers and other persons and
> entities engaged in the marketing, offer, sale, resale, or distribution
> of any digital asset will need to analyze the relevant transactions to
> determine if the federal securities laws apply.

86.     Investors who bought KNC tokens invested money or other valuable consideration,

such as bitcoin and ether, in a common enterprise—Kyber Network.  Investors had a reasonable

expectation of profit based upon Kyber Network's efforts, including, among other things, Kyber

Network obtaining listing of KNC tokens on various crypto-asset exchanges.

### 1.     KNC Token Purchasers Invested Money

87.     Investors in KNC tokens made an investment of money or other valuable

consideration for purposes of *Howey*.  The SEC Framework states:  "The first prong of the *Howey*

test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased

or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency,

another digital asset, or other type of consideration."

88.     Investors invested traditional and other digital currencies, such as bitcoin and ether,

to purchase the KNC tokens.  KNC tokens were listed on many crypto-asset exchanges, and those

crypto-asset exchanges permitted investors to purchase KNC with bitcoin and ether.

## 2.   KNC Token Investors Participated In A Common Enterprise

89.    The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

90.    The KNC tokens are no different.  Investors were passive participants in the KNC token ICO and the profits of each investor were intertwined with those of both Kyber Network and of other investors.  Kyber Network was responsible for supporting KNC, pooled investors' assets, and controlled those assets.  Kyber Network also retained a significant stake in KNC, thus sharing in the profits and risk of the venture.

91.    The success of the KNC tokens was necessarily linked to the success of Defendants' efforts, because at the time of the ICO there was no operational platform on which to utilize the tokens for any purpose.   Indeed, the tokens do not appear to have even been transferable anywhere—not even to exchanges for secondary trading—until a week after the ICO:



  
92.     Accordingly, investors in KNC participated in a common enterprise by purchasing the token.

### 3.     KNC Token Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them

93.     As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

94.     Investors in the KNC tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The KNC token was sold to investors prior to a network or "ecosystem" on which it could be used being fully developed.

95.     Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets (such as KNC) thereby satisfy the *Howey* test:

96.     The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
  - The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

- o    This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

    - o    The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.  For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

    - o    The expertise of an AP or its ability to build or grow the value of the network or digital asset.

    - o    The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

    - o    The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

o     The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

o     The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

o     The ready transferability of the digital asset is a key selling feature.

o     The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

o     The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

97.     The SEC Framework clarifies that investors purchased KNC tokens with a reasonable expectation of profits.

98.     The whitepaper stated that "[t]he burning of tokens could potentially increase the appreciation of the remaining KNC tokens as the total supply in circulation reduces."

99.     Kyber Network has continued to promote KNC as a worthwhile investment for long-term value.  In March 2020, for example, Luu stated in an interview that "KNC will be the FIRST deflationary token with a staking mechanism, where token burn and staking rewards are determined by actual network usage," and that a pending upgrade to Kyber Network would "ultimately enhance[e] liquidity for the ecosystem, Kyber Network growth, and KNC value creation."

100.     Kyber Network likewise continues to promote its "burn rate," which is an essential driver for any return on KNC investors' investment.  In August 2019, Kyber Network posted on Twitter that it had "crossed the 2 Million burned KNC milestone within 3 months from our first 1 million burn day! …  Let's keep this momentum going!"  And in a June 2020 tweet, Kyber

Network announced that it had "hit another milestone before [their] Katalyst and @KyberDAO

launch! Over 5 million tokens have been burned!"

### 4. Investors Expected Profits From The KNC Tokens To Be Derived From The Managerial Efforts Of Issuers

101.   The SEC Framework provides that the "inquiry into whether a purchaser is relying

on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on

the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those

essential managerial efforts which affect the failure or success of the enterprise,' as opposed to

efforts that are more ministerial in nature?"

102.   The SEC explained in its Framework, further underlining the depth of study the

agency had devoted to the matter over the years and the complexity of such legal analysis from

the perspective of a reasonable investor, that the more of the following characteristics that are

present, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  o   Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

33

o    The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

o    The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

103.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

    o    This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

    o    If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

34

      o     There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

      o     The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

      o     An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

104.    Purchasers of pre-functional tokens, such as KNC, necessarily rely on the managerial efforts of others to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens. The KNC token was a security at issuance because profits from KNC would be derived primarily from the managerial efforts of Kyber Network in developing the associated network on which KNC would function, rather than having its profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

105.    This dependency on the managerial efforts of Kyber Network, however, was not apparent at issuance to a reasonable investor. Considering the limited available information about how KNC was designed and intended to operate, if such an investor were even able to interpret

the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether KNC was a security until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the token she had acquired was a security.  It was only after the passage of some significant amount of time, and only with more information about Kyber Network's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

106.    Investors' profits in KNC tokens were to be derived from the managerial efforts of others, specifically Kyber Network and its co-founders and development teams.  KNC token investors relied on the managerial and entrepreneurial efforts of Kyber Network and their executive and development teams to manage and develop the projects funded by the KNC ICO.

107.    The Individual Defendants' biographies were also prominently featured on Kyber Network's website prior to the ICO.  Luu was described as "a researcher working on cryptocurrencies, smart contract security and distributed consensus algorithms" and "a regular invited speaker at Bitcoin and Ethereum workshops."  Tran was described as having "experience in developing large-scale infrastructures for multiple social marketing platforms and advertising networks."  Velner was promoted as "an experienced software developer with over 10 years as a senior software engineer and a technical leader."

108.    Under the Framework, notwithstanding the complexity of the issue to a reasonable investor, KNC satisfies most if not all of the factors described as relevant to its determination that a digital asset is a security.  Kyber Network created KNC tokens from thin air. Kyber Network represented that it would develop an ecosystem (the overall network of individuals using KNC or

participating in the development of its network) that would increase the value of KNC tokens. Plaintiff and the Class reasonably expected Kyber Network to provide significant managerial efforts, to develop and improve the KNC ecosystem, to develop and sustain a supportive network, and to secure listings at exchanges through which KNC tokens could be traded or liquidated.  And Kyber Network represented that it would provide significant managerial efforts to achieve these objectives and make KNC a success.

109.    The success of Kyber Network's promotional efforts in cultivating interest from U.S. investors was on display in one post to a public message board shortly after its ICO, days before KNC was listed on Binance and other exchanges:



**H.      The SEC Has Concluded That Tokens Such As KNC Are Securities**

110.    On September 30, 2019, the SEC found that Block.one, another issuer of a similar digital token, had violated the Securities Act through its unregistered sale to U.S. investors of a token called EOS.  EOS, like KNC, was a digital token that was not marketed to investors as a security, but—by application of the SEC's Framework—*was* a security in that it constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  Notably, the SEC enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

111.    In arriving at its determination that the EOS token was a security, the SEC reached the following conclusions:

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws"

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

As a result of the SEC's enforcement action, Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC's recent conclusion—that EOS is a security—applies with equal force to KNC.

**I.      The Class Has Suffered Significant Damages From Defendants' Actions**

112.      The KNC tokens today are worth far less than the price Plaintiff and the Class paid for them.  As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the KNC token and were denied the information that would have been contained in the materials required for the registration of KNC—have suffered significant damages in an amount to be proven at trial.

113.      Indeed, the price of KNC tokens has dropped more than 80 percent from its 2018 high.  To the extent Plaintiff and the Class still hold KNC tokens, they hereby demand rescission and make any necessary tender of the KNC tokens.

## V.    DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT PREVENTED PLAINTIFF AND MEMBERS OF THE CLASS FROM BRINGING A CLAIM AT THE TIME THE EVENTS OCCURRED

114.    Consistent with the perspective of a reasonable investor, neither Plaintiff nor members of the Class were in a position to appreciate their ability to bring claims based on Defendants' misconduct until April 3, 2019, at the earliest. Plaintiff makes the following allegations regarding Defendants' intentional or reckless statements and conduct solely for purposes of alleging the timeliness of all of Plaintiff's and the Class's claims, which do not sound in fraud.

115.    In the whitepapers describing the KNC tokens, as well as in their social media and other marketing, as described above, Defendants deliberately created the impression that KNC was not a security, would be entirely decentralized, and would have utility for end-users of the platform. These representations were false.

116.    Defendants repeatedly compared KNC to Bitcoin and other crypto-assets that are not securities.  Bitcoin is a commodity because from its inception it was functional as a medium of exchange and decentralized from private or governmental control.  The same is true of Ethereum and other crypto-assets that were well-known at the time of Kyber Network's ICO.  When the Bitcoin and Ethereum systems were created, only a tiny fraction of the underlying crypto-asset units were in existence.  As a result, increases in bitcoin and ether could occur at a fixed rate over time, such as from mining. The growth of Bitcoin and Ethereum thus occurs through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem. Another defining feature of Bitcoin specifically is its fixed supply cap, which necessarily renders it a deflationary asset.

117.    By contrast, Kyber Network issued a substantial portion of the KNC tokens at issuance, at very little economic cost to Kyber Network's founders.  The creation of KNC tokens

thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This, however, would not have been apparent at issuance to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that KNC was something other than a security, when it *was* a security.

118.    In sum, in the face of representations that "cryptocurrencies such as Bitcoin, Ethereum and others have been gaining tractions of late," promises that KNC would "promote the adoption of KyberNetwork in the cryptocurrency ecosystem," that KNC was "the first deflationary staking token" whose "supply will decrease over time," and considering the new technology at issue and Kyber Network's other statements, many investors were understandably unaware that KNC tokens had fundamentally different features than other crypto-assets, which the SEC has determined are not securities.

119.    Defendants also repeatedly emphasized the decentralized nature of its protocol as a "trustless *decentralized* exchange and payment service." (Emphasis added.) But Defendants did not explain critical ways in which it was not decentralized and depended on the concerted efforts of their team.

120.    First, and fundamentally, the Kyber Network protocol requires the design and development efforts from Defendants and their employees in order to advertise and operate the network.  Only in July 2020—nearly three years after the ICO, and after the filing of this lawsuit— did Defendants implement a system, which was not included in the original design of the protocol, where community members have a vote in governance decisions about the protocol.

121.    Second, while the whitepaper promised a role for "operators" to, among other things, "add and remove reserve entities"—that is, approve the listing and delisting of additional tokens—"Kyber Network is currently the only network operator" according to Defendants' technical documentation. That is, the power to choose what tokens operated on the protocol laid solely with Kyber Network, and not with others in the community as promised.

122.    Defendants also misrepresented the utility of KNC, both at its launch and beyond the launch.

123.    In August 2017, when the exchange was still not operational, Luu nonetheless told Forbes that Kyber Network was "a new decentralized exchange built on the Ethereum blockchain that allows for the instantaneous trading of any cryptocurrency with high liquidity." Luu went on to discuss bitcoin and ether trades, and portrayed Kyber Network as a mere facilitator of such non-securities transactions:

> If a user or a company has a wallet that only accepts Bitcoin, but their friend or customer wants to send them Ether (the Ethereum token) or any of the 800 less known cryptocurrency tokens, KyberNetwork acts in the background to facilitate and enable that transaction. Kyber Network strives to achieve both security and usability for a cryptocurrency exchange.  Most decentralized exchanges are hard to use for mainstream users.  On the other hand, Kyber Network allows users trade any cryptocurrency instantly and with low fees due to a reserve management system that guarantees liquidity for tokens available on the platform. Because it is decentralized and "on chain," there is no need to question the integrity of the exchange, as every transaction is handled by smart contracts on the blockchain.

124.    Similarly, Defendants' statements emphasize various uses for the KNC token. According to the whitepaper, KNC tokens are "*required* for reserves to participate in the network" and that "partners will be paid in KNC for every trade that they introduce to Kyber Network" and that a fee "will be paid by the reserve to Kyber Network platform in KNC."  Similarly, the whitepaper explained that it would introduce derivatives for the "users" of KNC.  Taken together,

such statements in the whitepaper created the misleading impression that KNC tokens could be *used* by token holders for services.

125.    In reality, the KNC token is invisible to end users of Kyber Network protocol. Kyber Network allows for the instant exchange of two crypto-assets.  But users exchanging the asset never need to own or use KNC to make the exchange, because users do not pay the KNC-based fee themselves. Only the few issuers who list on Kyber have a use for KNC, not the tens of thousands of purchasers of KNC during the ICO, nor the many more who have purchased KNC since.

126.    Under the misapprehension, as a result of Defendants' fraudulent statements and omissions, that KNC was not a security, Plaintiff and members of the Class did not realize that they were in a position to bring claims under federal or state law regulating securities. Defendants' misrepresentations would not have been apparent until, at the earliest, April 3, 2019, when the SEC clarified the legal paradigm for assessing the security status of crypto-assets like KNC.

127.    Indeed, independent of Defendants' state of mind in making the misleading misstatements and omissions described above, these misstatements and omissions—which reflected the massive asymmetry in information available to Defendants and unavailable to Plaintiff and the Class—prevented Plaintiff and the Class from realizing that they were in a position to bring claims under federal or state law regulating securities until April 3, 2019, at the earliest.

## VI.    CLASS ALLEGATIONS

128.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Class:  All persons who purchased KNC tokens, which were first sold on or about September 15, 2017, in a domestic U.S. transaction and were injured thereby. The Class Period is thus September 15, 2017 through the present.

129.    The Class excludes individuals subject to any enforceable arbitration clause contained in any of the purchase agreements executed in connection with their purchase of KNC.   Subject to the below, the Class includes all other individuals who purchased KNC tokens, including those individuals who purchased KNC tokens in sales made through online crypto-asset exchanges.

130.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131.    Plaintiff reserves the right to amend the Class definitions if investigation or discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

132.    The members of the Class are so numerous that joinder of all members is impracticable.   The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

133.    Members of the Class are readily ascertainable and identifiable.   Members of the Class may be identified by publicly accessible blockchain ledger information and records maintained by Defendants or their agents.   They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

134.    Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.   Plaintiff does not have any interest that is in conflict with the interests of the members of the Class.

135.    Plaintiff and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the KNC tokens.

136.    Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to those of the Class.

137.    Common questions and answers of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether KNC is a security under federal and state law;

- Whether Kyber Network failed to register KNC as a security under applicable federal and state law;

- Whether Kyber Network offered or sold KNC to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to recover the monies they paid thereunder.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

139.    There will be no difficulty in the management of this action as a class action.

## VII.   CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**(SECURITIES ACT – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Kyber Network)**

140.   Plaintiff realleges the allegations above.

141.   Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

142.   Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

143.   When issued, the KNC tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Kyber Network promoted, solicited or sold KNC tokens from Plaintiffs and members of the Class. Kyber Network thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the

mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

144.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

145.    Accordingly, Kyber Network has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

146.    Plaintiffs and Class members who own KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including applicable costs, attorneys' fees, and interest.

147.    Plaintiffs and Class Members who no longer own KNC tokens seem damages for any KNC Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

**SECOND CAUSE OF ACTION**
**(SECURITIES ACT – ADDITIONAL LIABILITY)**

**Control Person Liability for Violations of**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Luu, Tran, and Velner)**

148.    Plaintiff realleges the allegations above.

149.     This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

150.     Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of purchases of KNC tokens.

151.     The Individual Defendants had and have the power to direct or cause the direction of the management and policies of Kyber Network.

152.     The Individual Defendants, separately or together, have sufficient influence to have caused Kyber Network to solicit transactions of securities.

153.     The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Kyber Network's solicitation of securities.

154.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered for KNC tokens sold during the Class Period.

### THIRD CAUSE OF ACTION
### (ALABAMA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Ala. Code § 8-6-19
### (Kyber Network)

155.     Plaintiff realleges the allegations above.

156.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Alabama.

157.    The Alabama Securities Act forbids the offer or sale of unregistered securities. Ala. Code § 8-6-4. Any person who offers or sells a security in violation of Section 8-6-4 is "liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition." *Id.* § 8-6-19(a).

158.    When issued, the KNC tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-2. On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Alabama. The KNC tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act. *Id.* § 8-6-10.

159.    On information and belief, the KNC tokens were offered or sold in Alabama, including without limitation through solicitations directed by Kyber Network to Alabama and received in Alabama.

160.    Accordingly, Kyber Network has violated the Alabama Securities Act through Kyber Network's sale of unregistered securities.

161.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

162.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FOURTH CAUSE OF ACTION
## (ALABAMA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### Ala. Code § 8-6-19
### (Luu, Tran, and Velner)

163.     Plaintiff realleges the allegations above.

164.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Alabama.

165.     Every person who directly or indirectly controls an entity liable under the Alabama Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct" is jointly and severally liable "with and to the same extent" as the seller, unless the non-seller "is able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Ala. Code § 8-6-19(c).

166.     When issued, the KNC tokens were securities within the meaning of the Alabama Securities Act. *Id.* § 8-6-19. On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Alabama. The KNC tokens were neither registered under, nor subject to exemption from registration under the Alabama Securities Act.

167.     On information and belief, Kyber Network offered and sold the KNC tokens in Alabama, including without limitation through solicitations directed by Kyber Network to Alabama and received in Alabama.

168.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged

49

herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

169.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Alabama Securities Act through Kyber Network's offer or sale of unregistered securities.

170.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

171.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTH CAUSE OF ACTION
### (ALASKA STATE LAW – PRIMARY LIABILITY)

#### Unregistered Sale of Securities
#### AS § 45.56.710
#### (Kyber Network)

172.    Plaintiff realleges the allegations above.

173.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Alaska.

174.    The Alaska Securities Act forbids the sale of unregistered securities. AS § 45.56.100. Any person who sells a security in violation of Section 45.56.100 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase,

costs, and attorney fees as determined by the court, upon the tender of the security, or for actual damages," defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest under AS § 09.30.070, or eight percent a year, whichever is greater, from the date of the purchase, costs, and attorney fees as determined by the court." *Id.* § 45.56.710.

175.    When issued, the KNC tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Alaska. The KNC tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act. *Id.* § 45.56.110.

176.    On information and belief, the KNC tokens were sold in Alaska, including without limitation through solicitations directed by Kyber Network to Alaska and received in Alaska.

177.    Accordingly, Kyber Network has violated the Alaska Securities Act through Kyber Network's sale of unregistered securities.

178.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

179.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SIXTH CAUSE OF ACTION
## (ALASKA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### AS § 45.56.710(g)
### (Luu, Tran, and Velner)

180.    Plaintiff realleges the allegations above.

181.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Alaska.

182.    Every person who "directly or indirectly controls a person liable under" the Alaska Securities Act for unlawfully selling unregistered securities, as well as every "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions," every "individual who is an employee of or associated with a person liable … and who materially aids the conduct giving rise to the liability," and every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability" is "jointly and severally with and to the same extent as" the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 45.56.710(g).

183.    When issued, the KNC tokens were securities within the meaning of the Alaska Securities Act. *Id.* § 45.56.900. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Alaska. The KNC tokens were neither registered under, nor subject to exemption from registration under the Alaska Securities Act.

184.    On information and belief, Kyber Network sold the KNC tokens in Alaska, including without limitation through solicitations directed by Kyber Network to Alaska and received in Alaska.

185.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to

engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

186.   Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Alaska Securities Act through Kyber Network's sale of unregistered securities.

187.   Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

188.   Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTH CAUSE OF ACTION**
**(ARIZONA STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**A.R.S. § 44-2001**
**(Kyber Network)**

189.   Plaintiff realleges the allegations above.

190.   This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Arizona.

191.   The Arizona Securities Act forbids the sale of unregistered securities. A.R.S. § 44-1841. Any purchase of a security in violation of Section 44-1841 is "voidable at the election of the purchaser," who "may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities." *Id.* § 44-2001.

192.     When issued, the KNC tokens were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Arizona. The KNC tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act. *Id.* § 1843.

193.     On information and belief, the KNC tokens were sold in Arizona, including without limitation through solicitations directed by Kyber Network to Arizona and received in Arizona.

194.     Accordingly, Kyber Network has violated the Arizona Securities Act through Kyber Network's sale of unregistered securities.

195.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

196.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTH CAUSE OF ACTION
## (ARIZONA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### A.R.S. § 44-2003
### (Luu, Tran, and Velner)

197.     Plaintiff realleges the allegations above.

198.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Arizona.

199.     Any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale of securities under the Arizona Securities Act "shall be jointly and severally liable to the person who is entitled to maintain" an action under A.R.S. § 44-2001. A.R.S. § 44-2003.

200.    When issued, the KNC tokens were securities within the meaning of the Arizona Securities Act. *Id.* § 1801. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Arizona. The KNC tokens were neither registered under, nor subject to exemption from registration under the Arizona Securities Act.

201.    On information and belief, Kyber Network sold the KNC tokens in Arizona, including without limitation through solicitations directed by Kyber Network to Arizona and received in Arizona.

202.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

203.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Arizona Securities Act through Kyber Network's sale of unregistered securities.

204.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

205.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINTH CAUSE OF ACTION
## (ARKANSAS STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer or Sale of Securities
### Ark. Stat. Ann. § 23-42-106(a)
### (Kyber Network)

206.   Plaintiff realleges the allegations above.

207.   This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Arkansas.

208.   The Arkansas Securities Act forbids the offer or sale of unregistered securities. Ark. Code Ann. § 23-42-501. Any person who offers or sells a security in violation of Section 23-42-501 is liable to the person buying the security from him, who "may recover costs and reasonable attorney's fees plus: (A) [u]pon tender of the security, the consideration paid for the security and interest at six percent (6%) per year from the date of payment, less the amount of any income received from owning the security; or (B)(i) [d]amages if the buyer no longer owns the security." *Id.* § 23-42-106(a)(1) – (2)(B)(i). "Damages are the amount that would be recoverable upon a tender of the security less the value of the security when the buyer disposed of the security plus interest at six percent (6%) per year from the date of disposition of the security." *Id.* § 23-42-106(a)(2)(B)(ii).

209.   When issued, the KNC tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Arkansas. The KNC tokens were neither registered under, nor subject to exemption from registration under the Arkansas Securities Act. *Id.* § 23-42-503.

210.   On information and belief, the KNC tokens were offered or sold in Arkansas, including without limitation through solicitations directed by Kyber Network to Arkansas and received in Arkansas.

211.    Accordingly, Kyber Network has violated the Arkansas Securities Act through Kyber Network's sale of unregistered securities.

212.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

213.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TENTH CAUSE OF ACTION**
**(ARKANSAS STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Ark. Stat. Ann § 23-42-106**
**(Luu, Tran, and Velner)**

214.    Plaintiff realleges the allegations above.

215.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Arkansas.

216.    Every person who controls a person liable under the Arkansas Securities Act for unlawfully selling unregistered securities, as well as every partner, officer, or director of the seller and any other person occupying a similar status or performing a similar function with respect to the seller is jointly and severally liable for the actions of the seller, unless the non-seller satisfies the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of actions of the seller that give rise to the liability alleged to exist. *Id*. § 23-42-106(d).

217.    When issued, the KNC tokens were securities within the meaning of the Arkansas Securities Act. *Id.* § 23-42-102(17). On information and belief, Kyber Network offered and sold

the KNC tokens to members of the Class in Arkansas. The KNC tokens were not registered under, nor subject to exemption from registration under the Arkansas Securities Act.

218.     On information and belief, Kyber Network offered and sold the KNC tokens in Arkansas, including without limitation through solicitations directed by Kyber Network to Arkansas and received in Arkansas.

219.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

220.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Arkansas Securities Act through Kyber Network's offer or sale of unregistered securities.

221.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

222.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ELEVENTH CAUSE OF ACTION
### (CALIFORNIA STATE LAW – PRIMARY LIABILITY)

**Unqualified Offer or Sale of Securities**
**Cal. Corp. Code § 25503**
**(Kyber Network)**

223.     Plaintiff realleges the allegations above.

224.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in California.

225.    The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of Sections 25110 or 25130 are "liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received therefrom, upon the tender of such security, or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) his purchase price plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." *Id.* § 25503.

226.    When issued, the KNC tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in California. The KNC tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act. *Id.* §§ 25110, 25130.

227.    On information and belief, the KNC tokens were offered or sold in California, including without limitation through solicitations directed by Kyber Network to California and received in California.

228.    Accordingly, Kyber Network has violated the California Securities Act through Kyber Network's sale of unqualified securities.

229.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

230.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWELFTH CAUSE OF ACTION**
**(CALIFORNIA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Cal. Corp. Code § 25504**
**(Luu, Tran, and Velner)**

231.     Plaintiff realleges the allegations above.

232.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in California.

233.     Every person who directly or indirectly controls an entity liable under the California Securities Act for unlawfully selling unqualified securities as well as "every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 25504.

234.     When issued, the KNC tokens were securities within the meaning of the California Securities Act. *Id.* § 25019. On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in California. The KNC tokens were neither qualified under, nor subject to exemption from qualification under the California Securities Act.

235.    On information and belief, Kyber Network offered and sold the KNC tokens in California, including without limitation through solicitations directed by Kyber Network to California and received in California.

236.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unqualified securities.

237.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the California Securities Act through Kyber Network's offer or sale of unqualified securities.

238.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

239.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTEENTH CAUSE OF ACTION
### (COLORADO STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Colo. Rev. Stat § 11-51-604**
**(Kyber Network)**

**240.**    Plaintiff realleges the allegations above.

241.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in the State of Colorado.

242.     The Colorado Securities Act forbids the sale of unregistered securities. Colo. Rev. Stat. § 11-51-301. Any person who sells a security in violation of Section 301 "is liable to the person buying the security from such seller for the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition." *Id.* § 11-51-604(1).

243.     When issued, KNC tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, Kyber Network sold KNC tokens to members of the Class in the State of Colorado. The KNC tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act. *Id.* § 11-51-301.

244.     On information and belief, KNC tokens were sold in the State of Colorado, including without limitation through solicitations directed by Kyber Network to the State of Colorado and received in the State of Colorado.

245.     Accordingly, Kyber Network has violated the Colorado Securities Act through Kyber Network's sale of unregistered securities.

246.     Class members who own KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

247.     Class members who no longer own KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FOURTEENTH CAUSE OF ACTION**
**(COLORADO STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Colo. Rev. Stat. § 11-51-604**
**(Luu, Tran, and Velner)**

248.    Plaintiff realleges the allegations above.

249.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in the State of Colorado.

250.    Every person who directly or indirectly controls an entity liable under the Colorado Securities Act for unlawfully selling unregistered securities, "is liable jointly and severally with and to the same extent as such controlled person, unless the controlling person sustains the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Colo. Rev. Stat. § 11-51-604(5).

251.    When issued, KNC tokens were securities within the meaning of the Colorado Securities Act. *Id.* § 11-51-201(17). On information and belief, Kyber Network sold KNC tokens to members of the Class in the State of Colorado. The KNC tokens were neither registered under, nor subject to exemption from registration under the Colorado Securities Act, and Kyber Network was not registered or exempt from registration under Colorado law. *Id.* §§ 11-51-301, 11-51-401(1).

252.    On information and belief, Kyber Network sold KNC tokens in the State of Colorado, including without limitation through solicitations directed by Kyber Network to the State of Colorado and received in the State of Colorado.

253.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged

herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

254.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Colorado Securities Act through Kyber Network's sale of unregistered securities.

255.    Class members who own KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

256.    Class members who no longer own KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTEENTH CAUSE OF ACTION
## (CONNECTICUT STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Conn. Gen. Stat. § 36b-29
### (Kyber Network)

257.    Plaintiff realleges the allegations above.

258.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in the State of Connecticut.

259.    The Connecticut Uniform Securities Act forbids the offer or sale of unregistered securities. Conn. Gen. Stat. § 36b-16. Any person who offers or sells a security in violation of Section 36b-16 "is liable to the person buying the security, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income

received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 36b-29(a).

260.    When issued, KNC tokens were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in the State of Connecticut. The KNC tokens were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act. *Id.* § 36b-16.

261.    On information and belief, the KNC tokens were offered or sold in the State of Connecticut, including without limitation through solicitations directed by Kyber Network to the State of Connecticut and received in the State of Connecticut.

262.    Accordingly, Kyber Network has violated the Connecticut Uniform Securities Act through Kyber Network's sale of unregistered securities.

263.    Class members who own KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

264.    Class members who no longer own KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTEENTH CAUSE OF ACTION
### (CONNECTICUT STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Conn. Gen. Stat. § 36b-29**
**(Luu, Tran, and Velner)**

265.    Plaintiff realleges the allegations above

266.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in the State of Connecticut.

267.    Every person who directly or indirectly controls an entity liable under the Connecticut Uniform Securities Act for unlawfully selling unregistered securities , as well as "every partner, officer or director of such a person, [and] every person occupying a similar status or performing similar functions," is jointly and severally liable "with and to the same extent" as the entity liable, unless "the person who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." Conn. Gen. Stat. § 36b-29(c).

268.    When issued, KNC tokens were securities within the meaning of the Connecticut Uniform Securities Act. *Id.* § 36b-3(19). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in the State of Connecticut. The KNC tokens were neither registered under, nor subject to exemption from registration under the Connecticut Uniform Securities Act, and Kyber Network was not registered or exempt from registration under Connecticut law. *Id.* §§ 36b-16, 36b-6(a).

269.    On information and belief, Kyber Network offered and sold KNC tokens in the State of Connecticut, including without limitation through solicitations directed by Kyber Network to the State of Connecticut and received in the State of Connecticut.

270.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

271.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Connecticut Uniform Securities Act through Kyber Network's offer or sale of unregistered securities.

272.    Class members who own KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

273.    Class members who no longer own KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTEENTH CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**D.C. Code Ann. § 31-5606.05**
**(Kyber Network)**

274.    Plaintiff realleges the allegations above.

275.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in the District of Columbia.

276.    The District of Columbia Securities and Investor Protection Act forbids the offer or sale of unregistered securities. D.C. Code Ann. § 31-5603.01. Any person who offers or sells a security in violation of Section 5603.01 is liable to the purchaser for "the consideration paid for the security, interest at the rate used in the Superior Court of the District of Columbia from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it" or for "damages if the buyer no longer owns the security" in the "amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition." *Id.* §31.5606.05(b).

277.     When issued, the KNC tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in District of Columbia. The KNC tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act. *Id.* §31.5601.01(31).

278.     On information and belief, the KNC tokens were offered or sold in District of Columbia, including without limitation through solicitations directed by Kyber Network to District of Columbia and received in District of Columbia.

279.     Accordingly, Kyber Network has violated the District of Columbia Securities and Investor Protection Act through Kyber Network's sale of unregistered securities.

280.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

281.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTEENTH CAUSE OF ACTION
### (DISTRICT OF COLUMBIA LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### D.C. Code Ann. § 31-5606.05
### (Luu, Tran, and Velner)

282.     Plaintiff realleges the allegations above.

283.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in District of Columbia.

284.     Every person who directly or indirectly controls an entity liable under the District of Columbia Securities Act for unlawfully selling unregistered securities, as well as "partner,

officer, or director of the person liable" or "a person occupying a similar status or performing similar functions" is "liable jointly and severally with, and to the same extent as the person liable, unless her or she is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution among the several persons so liable." D.C. Code Ann. § 31-5606.05(c).

285.    When issued, the KNC tokens were securities within the meaning of the District of Columbia Securities and Investor Protection Act. *Id.* § 517.021(22). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in District of Columbia. The KNC tokens were neither registered under, nor subject to exemption from registration under the District of Columbia Securities and Investor Protection Act, and Kyber Network.

286.    On information and belief, Kyber Network offered and sold the KNC tokens in District of Columbia, including without limitation through solicitations directed by Kyber Network to District of Columbia and received in District of Columbia.

287.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

288.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the District of Columbia Securities and Investor Protection Act through Kyber Network's offer or sale of unregistered securities.

289.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

290.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETEENTH CAUSE OF ACTION
### (FLORIDA STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities
Fla. Stat. § 517.211
(Kyber Network)**

291.    Plaintiff realleges the allegations above.

292.    This Cause of Action is brought on behalf of Plaintiff and Class members to whom KNC tokens were offered or sold in Florida.

293.    The Florida Securities and Investor Protection Act forbids the offer or sale of unregistered securities. Fla. Stat. § 517.07(1). Any person who offers or sells a security in violation of Section 517.07(1) is liable to the purchaser for "the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment," as well as reasonable attorneys' fees. *Id.* § 517.211.

294.    When issued, the KNC tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22). Kyber Network offered or sold the KNC tokens to Plaintiff and members of the Class in Florida. The KNC tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act. *Id.* §§ 517.051, 517.061.

295.    The KNC tokens were offered or sold in Florida, including without limitation through solicitations directed by Kyber Network to Florida and received in Florida.

296.    Accordingly, Kyber Network has violated the Florida Securities and Investor Protection Act through Kyber Network's sale of unregistered securities.

297.    Plaintiff and Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

298.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTIETH CAUSE OF ACTION**
**(FLORIDA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Fla. Stat. § 517.211**
**(Luu, Tran, and Velner)**

299.    Plaintiff realleges the allegations above.

300.    This Cause of Action is brought on behalf of Plaintiff and Class members to whom KNC tokens were offered or sold in Florida.

301.    Every person who directly or indirectly controls an entity liable under the Florida Securities and Investor Protection Act for unlawfully selling unregistered securities, as well as "every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security." *Id.* § 517.211(1).

302.    When issued, the KNC tokens were securities within the meaning of the Florida Securities and Investor Protection Act. *Id.* § 517.021(22).  Kyber Network offered and sold the

KNC tokens to Plaintiff and members of the Class in Florida. The KNC tokens were neither registered under, nor subject to exemption from registration under the Florida Securities and Investor Protection Act, and Kyber Network.

303. Kyber Network offered and sold the KNC tokens in Florida, including without limitation through solicitations directed by Kyber Network to Florida and received in Florida.

304. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

305. Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Florida Securities and Investor Protection Act through Kyber Network's offer or sale of unregistered securities.

306. Plaintiff and Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

307. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-FIRST CAUSE OF ACTION
## (GEORGIA STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Ga. Code Ann. § 10-5-58**
**(Kyber Network)**

308. Plaintiff realleges the allegations above.

309.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Georgia.

310.     The Georgia Uniform Securities Act forbids the sale of unregistered securities. Ga. Code Ann. § 10-5-20. Any person who sells a security in violation of Section 10-5-20 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of purchase, costs, and reasonable attorney fees determined by the Court upon the tender of the security or for actual damages." *Id.* § 10-5-58.

311.     When issued, the KNC tokens were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Georgia. The KNC tokens were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act. *Id.* § 10-5-10.

312.     On information and belief, the KNC tokens were sold in Georgia, including without limitation through solicitations directed by Kyber Network to Georgia and received in Georgia.

313.     Accordingly, Kyber Network has violated the Georgia Uniform Securities Act through Kyber Network's sale of unregistered securities.

314.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

315.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-SECOND CAUSE OF ACTION
## (GEORGIA STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Ga. Code Ann. § 10-5-58**
**(Luu, Tran, and Velner)**

316.    Plaintiff realleges the allegations above.

317.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Georgia.

318.    Every person who directly or indirectly controls an entity liable under the Georgia Uniform Securities Act for unlawfully selling unregistered securities, as well as "[a]n individual who is a managing partner, executive officer, or director of a person liable" including "an individual having similar status or performing similar functions," "[a]n individual who is an employee of or associated with the person liable, and who materially aids the conduct giving rise to the liability," and "[a] person who is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist." *Id.* §§ 10-5-58(g).

319.    When issued, the KNC tokens were securities within the meaning of the Georgia Uniform Securities Act. *Id.* § 10-5-2(31). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Georgia. The KNC tokens were neither registered under, nor subject to exemption from registration under the Georgia Uniform Securities Act.

320.    On information and belief, Kyber Network sold the KNC tokens in Georgia, including without limitation through solicitations directed by Kyber Network to Georgia and received in Georgia.

321.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

322.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Georgia Uniform Securities Act through Kyber Network's sale of unregistered securities.

323.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

324.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-THIRD CAUSE OF ACTION
### (HAWAII STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### HRS § 485A-509(d)
### (Kyber Network)

325.    Plaintiff realleges the allegations above.

326.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Hawaii.

327.    The Hawaii Uniform Securities Act forbids the offer or sale of unregistered securities. HRS § 485A-301. Any person who sells a security in violation of Section 485A-301 is "liable to the purchaser … the consideration paid for the security, less the amount of any income

received on the security, and interest at the legal rate of interest, from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages" if the purchaser no longer owns the security. *Id.* § 485A-509(b).

328. When issued, the KNC tokens were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § 485A-102. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Hawaii. The KNC tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act. *Id.* § 485A-201.

329. On information and belief, the KNC tokens were sold in Hawaii, including without limitation through solicitations directed by Kyber Network to Hawaii and received in Hawaii.

330. Accordingly, Kyber Network has violated the Hawaii Uniform Securities Act through Kyber Network's sale of unregistered securities.

331. Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

332. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-FOURTH CAUSE OF ACTION
## (HAWAII STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### HRS § 485A-509(g)
### (Luu, Tran, and Velner)

333. Plaintiff realleges the allegations above.

334. This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Hawaii.

335.    Every person who directly or indirectly controls an entity liable under the Hawaii Uniform Securities Act for unlawfully selling unregistered securities, as well as any "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. HRS § 485A-509(g).

336.    When issued, the KNC tokens were securities within the meaning of the Hawaii Uniform Securities Act. *Id.* § 485A-102. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Hawaii. The KNC tokens were neither registered under, nor subject to exemption from registration under the Hawaii Uniform Securities Act.

337.    On information and belief, Kyber Network sold the KNC tokens in Hawaii, including without limitation through solicitations directed by Kyber Network to Hawaii and received in Hawaii.

338.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

339.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Hawaii Uniform Securities Act through Kyber Network's sale of unregistered securities.

340. Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

341. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-FIFTH CAUSE OF ACTION**
**(IDAHO STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**I.C. § 30-14-509(b)**
**(Kyber Network)**

342. Plaintiff realleges the allegations above.

343. This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Idaho.

344. The Idaho Uniform Securities Act forbids the offer or sale of unregistered securities. I.C. § 30-14-301. Any person who sells a security in violation of Section 30-14-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3) of this section. *Id.* § 30-14-509(b)(1). The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of the judgment. The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities as adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

345.    When issued, the KNC tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102 (28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Idaho. The KNC tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act. *Id.* § 30-14-201.

346.    On information and belief, the KNC tokens were sold in Idaho, including without limitation through solicitations directed by Kyber Network to Idaho and received in Idaho.

347.    Accordingly, Kyber Network has violated the Idaho Uniform Securities Act through Kyber Network's sale of unregistered securities.

348.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

349.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-SIXTH CAUSE OF ACTION
### (IDAHO STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**I.C. § 30-14-509(g)**
**(Luu, Tran, and Velner)**

350.    Plaintiff realleges the allegations above.

351.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Idaho.

352.    Every person who directly or indirectly controls an entity liable under the Idaho Uniform Securities Act for unlawfully selling unregistered securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is

liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. I.C. § 30-14-509(g).

353.    When issued, the KNC tokens were securities within the meaning of the Idaho Uniform Securities Act. *Id.* § 30-14-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Idaho. *Id.* §§ 30-14-102(2), 30-14-102(4). The KNC tokens were not registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act.

354.    On information and belief, Kyber Network sold the KNC tokens in Idaho, including without limitation through solicitations directed by Kyber Network to Idaho and received in Idaho.

355.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

356.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Idaho Uniform Securities Act through Kyber Network's sale of unregistered securities.

357.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

358.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## TWENTY-SEVENTH CAUSE OF ACTION
## (ILLINOIS STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### 815 Ill. Comp. Stat. Ann. 5/13
### (Kyber Network)

359.    Plaintiff realleges the allegations above.

360.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Illinois.

361.    The Illinois Securities Law of 1953 forbids the sale of unregistered securities. 815 Ill. Comp. Stat. Ann. 5/5. Any person who sells a security in violation of Section 5/5 is "liable to the purchaser," who may recover "the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold," as well as "reasonable fees and expenses." *Id.* § 5/13.

362.    When issued, the KNC tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Illinois. The KNC tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953. *Id.* §§ 5/3, 5/4.

363.    On information and belief, the KNC tokens were sold in Illinois, including without limitation through solicitations directed by Kyber Network to Illinois and received in Illinois.

364.    Accordingly, Kyber Network has violated the Illinois Securities Law of 1953 through Kyber Network's sale of unregistered securities.

365.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of the initial Complaint in this action. Prior to filing the initial Complaint, Plaintiff has provided to Kyber Network, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of the Class, the purchase of any KNC tokens held by the Class, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

366.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

367.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWENTY-EIGHTH CAUSE OF ACTION**
**(ILLINOIS STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Luu, Tran, and Velner)**

368.    Plaintiff realleges the allegations above.

369.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Illinois.

370.    Every person who directly or indirectly controls an entity liable under the Illinois Securities Law of 1953 for unlawfully selling unregistered securities, as well as every "issuer,

controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser." *Id.* § 5/15(A).

371.     When issued, the KNC tokens were securities within the meaning of the Illinois Securities Law of 1953. *Id.* § 5/2.1. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Illinois. The KNC tokens were neither registered under, nor subject to exemption from registration under the Illinois Securities Law of 1953.

372.     On information and belief, Kyber Network sold the KNC tokens in Illinois, including without limitation through solicitations directed by Kyber Network to Illinois and received in Illinois.

373.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

374.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Illinois Securities Law of 1953 through Kyber Network's sale of unregistered securities.

375.     Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of the initial Complaint in this action. Prior to filing the initial Complaint, Plaintiff provided to the Individual Defendants, by registered or certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of the election to rescind, on behalf of the Class, the purchase of any KNC tokens held by the Class, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered or certified mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

376.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

377.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### TWENTY-NINTH CAUSE OF ACTION
### (INDIANA STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Indiana Code § 23-19-5-9(a)**
**(Kyber Network)**

378.     Plaintiff realleges the allegations above.

379.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Indiana.

380.     The Indiana Uniform Securities Act forbids the offer or sale of unregistered securities. Indiana Code § 23-19-3-1. Any person who sells a security in violation of Section 23-

19-3-1 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the greater of eight percent (8%) per annum or the rate provided for in the security from the date of the purchase, costs, and reasonable attorney's fees determined by the court or arbitrator, upon the tender of the security, or for actual damages …." *Id.* § 23-19-5-9(a).

381.    When issued, the KNC tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Indiana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Indiana Securities Act. *Id.* § 23-19-2-1

382.    On information and belief, the KNC tokens were sold in Indiana, including without limitation through solicitations directed by Kyber Network to Indiana and received in Indiana.

383.    Accordingly, Kyber Network has violated the Indiana Uniform Securities Act through Kyber Network's sale of unregistered securities.

384.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

385.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTIETH CAUSE OF ACTION**
**(INDIANA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Indiana Code § 23-19-5-9(d)**
**(Luu, Tran, and Velner)**

386.    Plaintiff realleges the allegations above.

387. This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Indiana.

388. Every person who directly or indirectly controls an entity liable under the Indiana Uniform Securities Act for unlawfully selling unregistered securities, as well as "individual who is a managing partner, executive officer, or director of a person liable," is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist Indiana Code § 23-19-5-9(d).

389. When issued, the KNC tokens were securities within the meaning of the Indiana Securities Act. *Id.* § 23-19-1-2(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Indiana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Indiana Securities Act.

390. On information and belief, Kyber Network sold the KNC tokens in Indiana, including without limitation through solicitations directed by Kyber Network to Indiana and received in Indiana.

391. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

392.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Indiana Uniform Securities Act through Kyber Network's sale of unregistered securities.

393.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

394.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-FIRST CAUSE OF ACTION**
**(IOWA STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**I.C.A. § 502.509(2)**
**(Kyber Network)**

395.     Plaintiff realleges the allegations above.

396.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Iowa.

397.     The Iowa Uniform Securities Act forbids the offer or sale of unregistered securities. I.C.A. § 502.301. Any person who sells a security in violation of Section 502.301 is "liable to the purchaser" for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages......." *Id.* § 502.509(2).

398.     When issued, the KNC tokens were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, Kyber Network sold the KNC tokens

87

to members of the Class in Iowa. The KNC tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act. *Id.* § 502.201.

399.    On information and belief, the KNC tokens were sold in Iowa, including without limitation through solicitations directed by Kyber Network to Iowa and received in Iowa.

400.    Accordingly, Kyber Network has violated the Iowa Uniform Securities Act through Kyber Network's sale of unregistered securities.

401.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

402.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-SECOND CAUSE OF ACTION**
**(IOWA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**I.C.A. § 502.509(7)**
**(Luu, Tran, and Velner)**

403.    Plaintiff realleges the allegations above.

404.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Iowa.

405.    Every person who directly or indirectly controls an entity liable under the Iowa Uniform Securities Act for unlawfully selling unregistered securities, as well as "managing partner, executive officer, or director of a person liable … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the

exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. I.C.A. § 502.509(7)

406.    When issued, the KNC tokens were securities within the meaning of the Iowa Securities Act. *Id.* § 502.102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Iowa. The KNC tokens were neither registered under, nor subject to exemption from registration under the Iowa Securities Act.

407.    On information and belief, Kyber Network sold the KNC tokens in Iowa, including without limitation through solicitations directed by Kyber Network to Iowa and received in Iowa.

408.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein.  Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

409.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Iowa Uniform Securities Act through Kyber Network's sale of unregistered securities.

410.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

411.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-THIRD CAUSE OF ACTION
## (KANSAS STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### Kan. Stat. Ann. § 17-12a509
### (Kyber Network)

412.    Plaintiff realleges the allegations above.

413.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Kansas.

414.    The Kansas Uniform Securities Act forbids the offer or sale of unregistered securities. Kan. Stat. Ann. § 17-12a301. Any person who sells a security in violation of Section 17-12a301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court, upon the tender of the security," or if the purchaser no longer owns the security, "[a]ctual damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest from the date of the purchase … costs, and reasonable attorneys' fees determined by the court." *Id.* § 17-12a509(b).

415.    When issued, the KNC tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Kansas. The KNC tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act. *Id.* § 17-12a301.

416.    On information and belief, the KNC tokens were sold in Kansas, including without limitation through solicitations directed by Kyber Network to Kansas and received in Kansas.

417.     Accordingly, Kyber Network has violated the Kansas Uniform Securities Act through Kyber Network's sale of unregistered securities.

418.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

419.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-FOURTH CAUSE OF ACTION
### (KANSAS STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Kan. Stat. Ann. § 17-12a509**
**(Luu, Tran, and Velner)**

420.     Plaintiff realleges the allegations above.

421.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Kansas.

422.     Every person who directly or indirectly controls an entity liable under the Kansas Uniform Securities Act for unlawfully selling unregistered securities, as well as any "individual who is a managing partner, executive officer, or director" of such an entity, "including an individual having a similar status or performing similar functions," and any "individual who is an employee of or associated with" such an entity "and who materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless the individual "sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Kan. Stat. Ann. § 17-12a509(g).

423.    When issued, the KNC tokens were securities within the meaning of the Kansas Uniform Securities Act. *Id.* § 17-12a102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Kansas. The KNC tokens were neither registered under, nor subject to exemption from registration under the Kansas Uniform Securities Act.

424.    On information and belief, Kyber Network sold the KNC tokens in Kansas, including without limitation through solicitations directed by Kyber Network to Kansas and received in Kansas.

425.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

426.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Kansas Uniform Securities Act through Kyber Network's sale of unregistered securities.

427.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

428.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-FIFTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**Ky. Rev. Stat. Ann. § 292.480**
**(Kyber Network)**

429.     Plaintiff realleges the allegations above.

430.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Kentucky.

431.     The Securities Act of Kentucky forbids the offer or sale of unregistered securities. Ky. Rev. Stat. Ann. § 292.340. Any person who offers or sells a security in violation of Section 292.340 is "liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security," or if the purchaser no longer owns the security, for damages in the "amount that would be recoverable upon a tender less … [t]he value of the security when the buyer is disposed of it; and … [i]nterest at the legal rate per annum from the date of disposition." *Id.* § 292.480(1).

432.     When issued, the KNC tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Kentucky. The KNC tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky. *Id.* § 292.340.

433.     On information and belief, the KNC tokens were offered or sold in Kentucky, including without limitation through solicitations directed by Kyber Network to Kentucky and received in Kentucky.

434. Accordingly, Kyber Network has violated the Securities Act of Kentucky through Kyber Network's offer and sale of unregistered securities.

435. Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

436. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**THIRTY-SIXTH CAUSE OF ACTION**
**(KENTUCKY STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Ky. Rev. Stat. Ann. § 292.480**
**(Luu, Tran, and Velner)**

437. Plaintiff realleges the allegations above.

438. This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Kentucky.

439. Every person who directly or indirectly controls an entity liable under the Securities Act of Kentucky for unlawfully offering or selling unregistered securities, as well as "every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Ky. Rev. Stat. Ann. § 292.480(4).

440.    When issued, the KNC tokens were securities within the meaning of the Securities Act of Kentucky. *Id.* § 292.310(19). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Kentucky. The KNC tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Kentucky.

441.    On information and belief, Kyber Network offered and sold the KNC tokens in Kentucky, including without limitation through solicitations directed by Kyber Network to Kentucky and received in Kentucky.

442.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

443.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Securities Act of Kentucky through Kyber Network's offer or sale of unregistered securities.

444.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

445.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-SEVENTH CAUSE OF ACTION
## (LOUISIANA STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**La. Stat. Ann. § 51:714**
**(Kyber Network)**

446.    Plaintiff realleges the allegations above.

447.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Louisiana.

448.    The Louisiana Securities Law forbids the offer or sale of unregistered securities. La. Stat. Ann. § 51:705. Any person who offers or sells a security in violation of Section 51:705 is "liable to the person buying such security, and such buyer may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security with interest thereon from the date of payment down to the date of repayment … less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees, upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security" in the amount "which equals the difference between the fair value of the consideration the buyer gave for the security and the fair value of the security at the time the buyer disposed of it, plus interest thereon from the date of payment to the date of repayment." *Id.* §§ 51:714(A); 51:712(A)(1).

449.    When issued, the KNC tokens were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Louisiana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law. *Id.* § 51:705.

450.   On information and belief, the KNC tokens were offered or sold in Louisiana, including without limitation through solicitations directed by Kyber Network to Louisiana and received in Louisiana.

451.   Accordingly, Kyber Network has violated the Louisiana Securities Law through Kyber Network's offer and sale of unregistered securities.

452.   Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

453.   Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### THIRTY-EIGHTH CAUSE OF ACTION
### (LOUISIANA STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**La. Stat. Ann. § 51:714**
**(Luu, Tran, and Velner)**

454.   Plaintiff realleges the allegations above.

455.   This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Louisiana.

456.   Every person who directly or indirectly controls an entity liable under the Louisiana Securities Act for unlawfully offering or selling unregistered securities, as well as "every general partner, executive officer, or director of such [entity], every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the [entity] unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and

in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist." La. Stat. Ann. § 51:714(B).

457.   When issued, the KNC tokens were securities within the meaning of the Louisiana Securities Law. *Id.* § 51:702(15)(b). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Louisiana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Louisiana Securities Law.

458.   On information and belief, Kyber Network offered and sold the KNC tokens in Louisiana, including without limitation through solicitations directed by Kyber Network to Louisiana and received in Louisiana.

459.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

460.   Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Louisiana Securities Law through Kyber Network's offer or sale of unregistered securities.

461.   Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

462.   Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## THIRTY-NINTH CAUSE OF ACTION
## (MAINE STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Me. Rev. Stat. tit. 32, § 16509**
**(Kyber Network)**

463.    Plaintiff realleges the allegations above.

464.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Maine.

465.    The Maine Uniform Securities Act forbids the offer or sale of unregistered securities. Me. Rev. Stat. tit. 32, § 16301. Any person who sells a security in violation of Section 16301 is "liable to the purchaser," who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and the interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 16509(2).

466.    When issued, the KNC tokens were securities within the meaning of the Maine Uniform Securities Act. *Id.* § 16102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Maine. The KNC tokens were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act. *Id.* § 16301.

467.    On information and belief, the KNC tokens were sold in Maine, including without limitation through solicitations directed by Kyber Network to Maine and received in Maine.

468.    Accordingly, Kyber Network has violated the Maine Uniform Securities Act through Kyber Network's sale of unregistered securities.

469.     Class members who own the KNC tokens have made or will make any necessary

tender and seek all remedies available at law or in equity for any KNC tokens purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

470.     Class members who no longer own the KNC tokens seek damages for any KNC

tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTIETH CAUSE OF ACTION**
**<u>(MAINE STATE LAW – ADDITIONAL LIABILITY)</u>**

**Control Person Liability**
**Me. Rev. Stat. tit. 32, § 16509**
**(Luu, Tran, and Velner)**

471.     Plaintiff realleges the allegations above.

472.     This Cause of Action is brought on behalf of Class members to whom KNC tokens

were sold in Maine.

473.     Every person who directly or indirectly controls an entity liable under the Maine

Uniform Securities Act for unlawfully selling unregistered securities, as well as any "managing

partner, executive officer or director" of such an entity, "including an individual having a similar

status or performing similar functions," any "individual who is an employee of or associated with"

such an entity "and who materially aids the conduct giving rise to the liability," and any "broker-

dealer, agent, investment adviser or investment adviser representative that materially aids the

conduct giving rise to the liability," is jointly and severally liable with and to the same extent as

the entity, unless the individual sustains the burden of proof that he did not know, and in the

exercise of reasonable care could not have known, of the existence of the facts by reason of which

liability is alleged to exist. Me. Rev. Stat. tit. 32, § 16509(7).

474.     When issued, the KNC tokens were securities within the meaning of the Maine

Uniform Securities Act. *Id.* § 16102(28). On information and belief, Kyber Network sold the KNC

tokens to members of the Class in Maine. The KNC tokens were neither registered under, nor subject to exemption from registration under the Maine Uniform Securities Act.

475.    On information and belief, Kyber Network sold the KNC tokens in Maine, including without limitation through solicitations directed by Kyber Network to Maine and received in Maine.

476.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

477.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Maine Uniform Securities Act through Kyber Network's sale of unregistered securities.

478.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

479.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTY-FIRST CAUSE OF ACTION
## (MARYLAND STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Md. Code Ann., Corps. & Ass'ns § 11-703
### (Kyber Network)

480.    Plaintiff realleges the allegations above.

481.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Maryland.

482.    The Maryland Securities Act forbids the offer or sale of unregistered securities. Md. Code Ann., Corps. & Ass'ns § 11-501. Any person who offers or sells a security in violation of Section 501 is "civilly liable to the person buying a security from him," who "may sue either at law or in equity … [o]n tender of the security, to recover the consideration paid for the security, together with interest at the rate provided for in § 11-107(a) of the [Maryland] Courts and Judicial Proceedings Article, as amended, from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security; or … [i]f he no longer owns the security, for damages" in "the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it and interest at the rate provided for in § 11-107(a) of the Courts and Judicial Proceedings Article, as amended, from the date of disposition." *Id.* § 11-703(a)(1)(i), (b)(1), (b)(3).

483.    When issued, the KNC tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Maryland. The KNC tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act. *Id.* § 11-501.

484.    On information and belief, the KNC tokens were offered or sold in Maryland, including without limitation through solicitations directed by Kyber Network to Maryland and received in Maryland.

485.    Accordingly, Kyber Network has violated the Maryland Securities Act through Kyber Network's offer and sale of unregistered securities.

486.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

487.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-SECOND CAUSE OF ACTION**
**(MARYLAND STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Md. Code Ann., Corps. & Ass'ns § 11-703**
**(Luu, Tran, and Velner)**

488.     Plaintiff realleges the allegations above.

489.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Maryland.

490.     Every person who directly or indirectly controls an entity liable under the Maryland Securities Act for unlawfully offering or selling unregistered securities, as well as "every person occupying a similar status or performing similar functions, every employee of the [entity] who materially aids in the conduct giving rise to the liability, and every broker-dealer or agent who materially aids in such conduct are also liable jointly and severally with and to the same extent as the [entity], unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 11-703(c)(1).

491.     When issued, the KNC tokens were securities within the meaning of the Maryland Securities Act. *Id.* § 11-101(s)(1). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Maryland. The KNC tokens were neither registered under, nor subject to exemption from registration under the Maryland Securities Act.

492.    On information and belief, Kyber Network offered and sold the KNC tokens in Maryland, including without limitation through solicitations directed by Kyber Network to Maryland and received in Maryland.

493.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

494.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Maryland Securities Act through Kyber Network's offer or sale of unregistered securities.

495.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

496.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-THIRD CAUSE OF ACTION
### (MASSACHUSETTS STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Mass. Gen. Laws Ann. ch. 110A, § 410(a)
### (Kyber Network)

497.    Plaintiff realleges the allegations above.

498.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Massachusetts.

499.    The Massachusetts Securities Act forbids the offer or sale of unregistered securities. Mass. Gen. Laws Ann. ch. 110A, § 301. Any person who offers or sells a security in violation of Section 301 is "is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 410(a).

500.    When issued, the KNC tokens were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Massachusetts. The KNC tokens were neither registered under, nor subject to exemption from registration under the Massachusetts Securities Act. *Id.* § 402.

501.    On information and belief, the KNC tokens were offered or sold in Massachusetts, including without limitation through solicitations directed by Kyber Network to Massachusetts and received in Massachusetts.

502.    Accordingly, Kyber Network has violated the Massachusetts Securities Act through Kyber Network's sale of unregistered securities.

503.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

504.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest

## FORTY-FOURTH CAUSE OF ACTION
## (MASSACHUSETTS STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### Mass. Gen. Laws Ann. ch. 110A, §410(b)
### (Luu, Tran, and Velner)

505.    Plaintiff realleges the allegations above.

506.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Massachusetts.

507.    Every person who directly or indirectly controls an entity liable under the Massachusetts Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Mass. Gen. Laws Ann. ch. 110A, §410(b).

508.    When issued, the KNC tokens were securities within the meaning of the Massachusetts Securities Act. *Id.* § 401(f). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Massachusetts. The KNC tokens were not registered under, nor subject to exemption from registration under the Massachusetts Securities Act.

509.    On information and belief, Kyber Network offered and sold the KNC tokens in Massachusetts, including without limitation through solicitations directed by Kyber Network to Massachusetts and received in Massachusetts.

510.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

511.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Massachusetts Securities Act through Kyber Network's offer or sale of unregistered securities.

512.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

513.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTY-FIFTH CAUSE OF ACTION
## (MICHIGAN STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### Mich. Comp. Laws Ann. § 451.2509
### (Kyber Network)

514.    Plaintiff realleges the allegations above.

515.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Michigan.

516.    The Michigan Securities Act forbids the offer or sale of unregistered securities. Mich. Comp. Laws Ann. § 451.2301. Any person who sells a security in violation of Section 451.2301 is "liable to the purchaser" who "may maintain an action to recover the consideration

paid for the security, less the amount of any income received on the security, and interest at 6% per year from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security," or for "actual damages" if the purchaser no longer owns the security. *Id.* § 451.2509.

517.    When issued, the KNC tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Michigan. The KNC tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act. *Id.* § 451.2201.

518.    On information and belief, the KNC tokens were sold in Michigan, including without limitation through solicitations directed by Kyber Network to Michigan and received in Michigan.

519.    Accordingly, Kyber Network has violated the Michigan Securities Act through Kyber Network's sale of unregistered securities.

520.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

521.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FORTY-SIXTH CAUSE OF ACTION
### (MICHIGAN STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Mich. Comp. Laws Ann. § 451.2509**
**(Luu, Tran, and Velner)**

522.    Plaintiff realleges the allegations above.

523.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Michigan.

524.    Every person who directly or indirectly controls an entity liable under the Michigan Securities Act for unlawfully selling unregistered securities, as well as an "individual who is a managing partner, executive officer, or director" of a person liable … including each individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Mich. Comp. Laws Ann. § 451.2509(7).

525.    When issued, the KNC tokens were securities within the meaning of the Michigan Securities Act. *Id.* § 451.2102c. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Michigan. The KNC tokens were neither registered under, nor subject to exemption from registration under the Michigan Securities Act, *id.* § 451.2201.

526.    On information and belief, Kyber Network sold the KNC tokens in Michigan, including without limitation through solicitations directed by Kyber Network to Michigan and received in Michigan.

527.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

528.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Michigan Securities Act through Kyber Network's sale of unregistered securities.

529.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

530.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-SEVENTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**Minnesota Statutes § 80A.76(b)**
**(Kyber Network)**

531.    Plaintiff realleges the allegations above.

532.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Minnesota.

533.    The Minnesota Securities Act forbids the offer or sale of unregistered securities. Minnesota Statutes § 80A.49(c). Any person who sells a security in violation of Section 80A.49(c) is "liable to the purchaser" for "consideration paid for the security, less the amount of any income received on the security, and interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 80A.76(b).

534.    When issued, the KNC tokens were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, Kyber Network sold the KNC tokens

to members of the Class in Minnesota. The KNC tokens were neither registered under, nor subject

to exemption from registration under the Minnesota Securities Act. *Id.* § 80A.45.

535.    On information and belief, the KNC tokens were sold in Minnesota, including

without limitation through solicitations directed by Kyber Network to Minnesota and received in

Minnesota.

536.    Accordingly, Kyber Network has violated the Minnesota Securities Act through

Kyber Network's sale of unregistered securities

537.    Class members who own the KNC tokens have made or will make any necessary

tender and seek all remedies available at law or in equity for any KNC tokens purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

538.    Class members who no longer own the KNC tokens seek damages for any KNC

tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FORTY-EIGHTH CAUSE OF ACTION**
**(MINNESOTA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Minnesota Statutes § 80A.76(g)**
**(Luu, Tran, and Velner)**

539.    Plaintiff realleges the allegations above.

540.    This Cause of Action is brought on behalf of Class members to whom KNC tokens

were sold in Minnesota.

541.    Every person who directly or indirectly controls an entity liable under the

Minnesota Securities Act for unlawfully selling unregistered securities, as well as "managing

partner, executive officer, or director of a person liable … including an individual having a similar

status or performing similar functions" is jointly and severally liable with and to the same extent

as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the

exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 80A.76(g).

542.    When issued, the KNC tokens were securities within the meaning of the Minnesota Securities Act. *Id.* § 80A.41(30). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Minnesota. The KNC tokens were neither registered under, nor subject to exemption from registration under the Minnesota Securities Act.

543.    On information and belief, Kyber Network sold the KNC tokens in Minnesota, including without limitation through solicitations directed by Kyber Network to Minnesota and received in Minnesota.

544.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

545.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Minnesota Securities Act through Kyber Network's sale of unregistered securities.

546.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

547.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FORTY-NINTH CAUSE OF ACTION
## (MISSISSIPPI STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### Miss. Code Ann. § 75-71-509(b)
### (Kyber Network)

548.    Plaintiff realleges the allegations above.

549.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Mississippi.

550.    The Mississippi Securities Act forbids the offer or sale of unregistered securities. Miss. Code Ann. § 75-71-301. "A person is liable to the purchaser if the person sells a security in violation of Section 75-71-301." *Id.* § 75-71-509(b). Such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or," *id.* § 75-71-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court," *id.* § 75-71-509(b)(3).

551.    When issued, the KNC tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Mississippi. The KNC tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act. *Id.* § 75-71-301.

552.    On information and belief, the KNC tokens were sold in Mississippi, including without limitation through solicitations directed by Kyber Network to Mississippi and received in Mississippi.

553.    Accordingly, Kyber Network has violated the Mississippi Securities Act through Kyber Network's sale of unregistered securities.

554.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

555.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTIETH CAUSE OF ACTION**
**(MISSISSIPPI STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Miss. Code Ann. § 75-71-509(g)**
**(Luu, Tran, and Velner)**

556.    Plaintiff realleges the allegations above.

557.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Mississippi.

558.    Every person who directly or indirectly controls an entity liable under the Mississippi Securities Act for unlawfully selling unregistered securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Miss. Code Ann. § 75-71-509(g).

559.    When issued, the KNC tokens were securities within the meaning of the Mississippi Securities Act. *Id.* § 75-71-102(28). On information and belief, Kyber Network sold the KNC

tokens to members of the Class in Mississippi. The KNC tokens were neither registered under, nor subject to exemption from registration under the Mississippi Securities Act.

560.    On information and belief, Kyber Network sold the KNC tokens in Mississippi, including without limitation through solicitations directed by Kyber Network to Mississippi and received in Mississippi.

561.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

562.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Mississippi Securities Act through Kyber Network's sale of unregistered securities.

563.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

564.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-FIRST CAUSE OF ACTION
### (MISSOURI STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Mo. Rev. Stat. § 409.5-509(b)**
**(Kyber Network)**

565.    Plaintiff realleges the allegations above.

566.   This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Missouri.

567.   The Missouri Securities Act forbids the offer or sale of unregistered securities. Mo. Rev. Stat. § 409.3-301. "A person is liable to the purchaser if the person sells a security in violation of section 409.3-301," and such purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or," *id.* § 409.5-509(b)(1), "[a]ctual damages … [in] the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court," *id.* § 409.5-509(b)(3).

568.   When issued, the KNC tokens were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Missouri. The KNC tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act. *Id.* § 409.3-301.

569.   On information and belief, the KNC tokens were sold in Missouri, including without limitation through solicitations directed by Kyber Network to Missouri and received in Missouri.

570.   Accordingly, Kyber Network has violated the Missouri Securities Act through Kyber Network's sale of unregistered securities.

571.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

572.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-SECOND CAUSE OF ACTION**
**(MISSOURI STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Mo. Rev. Stat. § 409.5-509(g)**
**(Luu, Tran, and Velner)**

573.    Plaintiff realleges the allegations above.

574.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Missouri.

575.    Every person who directly or indirectly controls an entity liable under the Missouri Securities Act for unlawfully selling unregistered securities, as well as any "managing partner, executive officer, or director of" such entity, and every person who was "an employee of or associated with" such entity "who materially aid[ed] the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. Mo. Rev. Stat. § 409.5-509(g).

576.    When issued, the KNC tokens were securities within the meaning of the Missouri Securities Act. *Id.* § 409.1-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Missouri. The KNC tokens were neither registered under, nor subject to exemption from registration under the Missouri Securities Act.

577.    On information and belief, Kyber Network sold the KNC tokens in Missouri, including without limitation through solicitations directed by Kyber Network to Missouri and received in Missouri.

578.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

579.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Missouri Securities Act through Kyber Network's sale of unregistered securities.

580.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

581.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-THIRD CAUSE OF ACTION
### (MONTANA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Mont. Code Ann. § 30-10-307(1)
### (Kyber Network)

582.    Plaintiff realleges the allegations above.

583.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Montana.

584.     The Montana Securities Act forbids the offer or sale of unregistered securities. Mont. Code Ann. § 30-10-202. "Any person who offers or sells a security in violation of 30-10-202 … is liable to the person buying the security from the offeror or seller, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 10% a year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the buyer no longer owns the security" in "the amount that would be recoverable upon a tender less: (a) the value of the security when the buyer disposed of it; and (b) interest at 10% a year from the date of disposition." *Id.* § 30-10-307(1).

585.     When issued, the KNC tokens were securities within the meaning of the Montana Securities Act. *Id.* § 30-10-103(24). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Montana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

586.     On information and belief, the KNC tokens were offered or sold in Montana, including without limitation through solicitations directed by Kyber Network to Montana and received in Montana.

587.     Accordingly, Kyber Network has violated the Montana Securities Act through Kyber Network's sale of unregistered securities.

588.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

589.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**FIFTY-FOURTH CAUSE OF ACTION**
**(MONTANA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**Mont. Code Ann. § 30-10-307(2)**
**(Luu, Tran, and Velner)**

590.     Plaintiff realleges the allegations above.

591.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Montana.

592.     "Every person who directly or indirectly controls a seller liable under subsection (1), every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of the seller, and every broker-dealer or salesperson who participates or materially aids in the sale is liable jointly and severally with and to the same extent as the seller if the nonseller knew, or in the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist." Mont. Code Ann. § 30-10-307(2).

593.     When issued, the KNC tokens were securities within the meaning of the Montana Securities Act. *Id.* § 30-10-103(24). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Montana. The KNC tokens were neither registered under, nor subject to exemption from registration under the Montana Securities Act. *Id.* § 30-10-202.

594.     On information and belief, Kyber Network offered or sold the KNC tokens in Montana, including without limitation through solicitations directed by Kyber Network to Montana and received in Montana.

595.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to

engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

596.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Montana Securities Act through Kyber Network's offer and sale of unregistered securities.

597.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

598.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-FIFTH CAUSE OF ACTION
### (NEBRASKA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Neb. Rev. Stat. § 8-1118(1)
### (Kyber Network)

599.    Plaintiff realleges the allegations above.

600.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Nebraska.

601.    The Nebraska Securities Act forbids the offer or sale of unregistered securities. Neb. Rev. Stat. § 8-1104. Any person who offers or sells a security in violation of section 8-1104 … shall be liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security" in "the amount that would be recoverable upon a tender less (a) the value

of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition." *Id.* § 8-1118(1).

602.    When issued, the KNC tokens were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Nebraska. The KNC tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

603.    On information and belief, the KNC tokens were offered or sold in Nebraska, including without limitation through solicitations directed by Kyber Network to Nebraska and received in Nebraska.

604.    Accordingly, Kyber Network has violated the Nebraska Securities Act through Kyber Network's sale of unregistered securities.

605.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

606.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## FIFTY-SIXTH CAUSE OF ACTION
## (NEBRASKA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### Neb. Rev. Stat. § 8-1118(3)
### (Luu, Tran, and Velner)

607.    Plaintiff realleges the allegations above.

608.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Nebraska.

609.    "Every person who directly or indirectly controls a person liable under subsections (1) … of this section, including every partner, limited liability company member, officer, director, or person occupying a similar status or performing similar functions of a partner, limited liability company member, officer, or director, or employee of such person who materially aids in the conduct giving rise to liability, and every broker-dealer, issuer-dealer, agent, investment adviser, or investment adviser representative who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Neb. Rev. Stat. § 8-1118(3).

610.    When issued, the KNC tokens were securities within the meaning of the Nebraska Securities Act. *Id.* § 8-1101(15). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Nebraska. The KNC tokens were neither registered under, nor subject to exemption from registration under the Nebraska Securities Act. *Id.* § 8-1104.

611.    On information and belief, Kyber Network offered or sold the KNC tokens in Nebraska, including without limitation through solicitations directed by Kyber Network to Nebraska and received in Nebraska.

612.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers and sales of unregistered securities.

613.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Nebraska Securities Act through Kyber Network's offer and sale of unregistered securities.

614.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

615.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-SEVENTH CAUSE OF ACTION
### (NEVADA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Nev. Stat. § 90.660(1)(b)
### (Kyber Network)

616.     Plaintiff realleges the allegations above.

617.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Nevada.

618.     The Nevada Securities Act forbids the offer or sale of unregistered securities. Nev. Stat. § 90.460. "A person who offers or sells a security in violation of" Neb. Rev. Stat. § 90.460 "is liable to the person purchasing the security." *Id.* § 90.660. "Upon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of [Nevada] from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security. A purchaser who no longer owns the security may recover damages" in "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of [Nevada] from the date of disposition of the security, costs and reasonable attorney's fees determined by the court." *Id.*

619.    When issued, the KNC tokens were securities within the meaning of the Nevada

Securities Act. *Id.* § 90.295.  On information and belief, Kyber Network offered or sold the KNC

tokens to members of the Class in Nevada. The KNC tokens were neither registered under, nor

subject to exemption from registration under the Nevada Securities Act. *Id.* § 90.460.

620.    On information and belief, the KNC tokens were offered or sold in Nevada,

including without limitation through solicitations directed by Kyber Network to Nevada and

received in Nevada.

621.    Accordingly, Kyber Network has violated the Nevada Securities Act through Kyber

Network's sale of unregistered securities.

622.    Class members who own the KNC tokens have made or will make any necessary

tender and seek all remedies available at law or in equity for any KNC tokens purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

623.    Class members who no longer own the KNC tokens seek damages for any KNC

tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-EIGHTH CAUSE OF ACTION
### (NEVADA STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Nev. Stat. § 90.660(4)**
**(Luu, Tran, and Velner)**

624.    Plaintiff realleges the allegations above.

625.    This Cause of Action is brought on behalf of Class members to whom KNC tokens

were offered or sold in Nevada.

626.    Every person who directly or indirectly controls an entity liable under the Nevada

Securities Act for unlawfully selling unregistered securities, as well as any "partner, officer or

director of the [entity] liable, a person occupying a similar status or performing similar functions,

any agent of the [entity] liable, an employee of the [entity] liable if the employee materially aids in the act, omission or transaction constituting the violation," is jointly and severally liable with and to the same extent as the entity, unless such person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist. Nev. Stat. § 90.660(4).

627. When issued, the KNC tokens were securities within the meaning of the Nevada Securities Act. *Id.* § 90.295. On information and belief, Kyber Network offered or sold the KNC tokens to members of the class in Nevada. The KNC tokens were neither registered under, nor subject to exemption from registration under the Nevada Securities Act.

628. On information and belief, Kyber Network offered or sold the KNC tokens in Nevada, including without limitation through solicitations directed by Kyber Network to Nevada and received in Nevada.

629. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

630. Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Nevada Securities Act through Kyber Network's offer or sale of unregistered securities.

631.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

632.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### FIFTY-NINTH CAUSE OF ACTION
### (NEW HAMPSHIRE STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**N.H. Rev. Stat. § 421-B:5-509(b)**
**(Kyber Network)**

633.    Plaintiff realleges the allegations above.

634.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in New Hampshire.

635.    The New Hampshire Uniform Securities Act forbids the offer or sale of unregistered securities. N.H. Rev. Stat. § 421-B:3-301. Any person who sells a security in violation of Section 421-B:3-301 is liable to the purchaser for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3)." *Id.* § 421-B:5-509(b)(1). The annual rate of interest on judgments is "a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point." *Id.* § 336-1 II.

636.    When issued, the KNC tokens were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, Kyber

127

Network sold the KNC tokens to members of the Class in New Hampshire. The KNC tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act. *Id.* § 421-B:2-201.

637. On information and belief, the KNC tokens were sold in New Hampshire, including without limitation through solicitations directed by Kyber Network to New Hampshire and received in New Hampshire.

638. Accordingly, Kyber Network has violated the New Hampshire Uniform Securities Act through Kyber Network's sale of unregistered securities.

639. Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

640. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTIETH CAUSE OF ACTION**
**<u>(NEW HAMPSHIRE STATE LAW – ADDITIONAL LIABILITY)</u>**

**Control Person Liability**
**N.H. Rev. Stat. § 421-B:5-509(g)**
**(Luu, Tran, and Velner)**

641. Plaintiff realleges the allegations above.

642. This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in New Hampshire.

643. Every person who directly or indirectly controls an entity liable under the New Hampshire Uniform Securities Act for unlawfully selling unregistered securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar

functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist. N.H. Rev. Stat. § 421-B:5-509(g).

644.    When issued, the KNC tokens were securities within the meaning of the New Hampshire Uniform Securities Act. *Id.* § 421-B:1-102(53)(A). On information and belief, Kyber Network sold the KNC tokens to members of the Class in New Hampshire. *Id.* §§ 421-B:1-102(3), 421-B:1-102(6). The KNC tokens were neither registered under, nor subject to exemption from registration under the New Hampshire Uniform Securities Act.

645.    On information and belief, Kyber Network sold the KNC tokens in New Hampshire, including without limitation through solicitations directed by Kyber Network to New Hampshire and received in New Hampshire.

646.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

647.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the New Hampshire Uniform Securities Act through Kyber Network's sale of unregistered securities.

648.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

649.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-FIRST CAUSE OF ACTION
### (NEW JERSEY STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**NJ Stat. Ann. § 49:3-71(a), (c)**
**(Kyber Network)**

650.     Plaintiff realleges the allegations above.

651.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in New Jersey.

652.     The New Jersey Uniform Securities Act forbids the offer or sale of unregistered securities. NJ Stat. Ann. § 49:3-60(e). Any person who offers or sells a security in violation of Section 49:3-60 is "liable  for the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security." *Id.* § 49:3-71(c).

653.     When issued, the KNC tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in New Jersey. The KNC tokens were neither registered

under, nor subject to exemption from registration under the New Jersey Securities Act. *Id.* § 49:3-50.

654.    On information and belief, the KNC tokens were offered or sold in New Jersey, including without limitation through solicitations directed by Kyber Network to New Jersey and received in New Jersey.

655.    Accordingly, Kyber Network has violated the New Jersey Uniform Securities Act through Kyber Network's sale of unregistered securities.

656.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

657.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-SECOND CAUSE OF ACTION**
**(NEW JERSEY STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**NJ Stat. Ann. § 49:3-71(d)**
**(Luu, Tran, and Velner)**

658.    Plaintiff realleges the allegations above.

659.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in New Jersey.

660.    Every person who directly or indirectly controls an entity liable under the New Jersey Uniform Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the

exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. *Id.* § 49:3-71(d)

661.    When issued, the KNC tokens were securities within the meaning of the New Jersey Securities Act. *Id.* § 49:3-49(m). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in New Jersey. The KNC tokens were neither registered under, nor subject to exemption from registration under the New Jersey Securities Act.

662.    On information and belief, Kyber Network offered and sold the KNC tokens in New Jersey, including without limitation through solicitations directed by Kyber Network to New Jersey and received in New Jersey.

663.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

664.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the New Jersey Uniform Securities Act through Kyber Network's offer or sale of unregistered securities.

665.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

666.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SIXTY-THIRD CAUSE OF ACTION**
**(NEW MEXICO STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**N.M. Stat. Ann. § 58-13C-509**
**(Kyber Network)**

667.    Plaintiff realleges the allegations above.

668.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in New Mexico.

669.    The New Mexico Uniform Securities Act forbids the sale of unregistered securities. N.M. Stat. Ann. § 58-13C-301. Any person who sells a security in violation of Section 58-13C-301 is "liable to the purchaser," who may "maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages," which are "the difference between the price at which the security was sold and the value the security would have had at the time of the sale in the absence of the purchaser's conduct causing liability, and interest at the legal rate of interest from the date of the sale of the security, costs and reasonable attorney fees determined by the court." *Id.* § 58-13C-509.

670.    When issued, the KNC tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, Kyber Network sold the KNC tokens to members of the Class in New Mexico. The KNC tokens were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act. *Id.* §§ 58-13C-201–202.

671.    On information and belief, the KNC tokens were sold in New Mexico, including without limitation through solicitations directed by Kyber Network to New Mexico and received in New Mexico.

672.    Accordingly, Kyber Network has violated the New Mexico Uniform Securities Act through Kyber Network's sale of unregistered securities.

673.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

674.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-FOURTH CAUSE OF ACTION
### (NEW MEXICO STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**N.M. Stat. Ann. § 58-13C-509**
**(Luu, Tran, and Velner)**

675.    Plaintiff realleges the allegations above.

676.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in New Mexico.

677.    Every person who directly or indirectly controls an entity liable under the New Mexico Uniform Securities Act for unlawfully selling unregistered securities, as well as every "individual who is a managing partner, executive officer or director of a person liable" and every "individual who is an employee of or associated with a person liable" is jointly and severally liable with and to the same extent as the seller, unless the non-seller "sustains the burden of proof that the person did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist." *Id.* § 58-13C-509(G).

678.    When issued, the KNC tokens were securities within the meaning of the New Mexico Uniform Securities Act. *Id.* § 58-13C-102(DD). On information and belief, Kyber Network sold the KNC tokens to members of the Class in New Mexico. The KNC tokens were neither registered under, nor subject to exemption from registration under the New Mexico Uniform Securities Act.

679.    On information and belief, Kyber Network sold the KNC tokens in New Mexico, including without limitation through solicitations directed by Kyber Network to New Mexico and received in New Mexico.

680.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

681.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the New Mexico Uniform Securities Act through Kyber Network's sale of unregistered securities.

682.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

683.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SIXTY-FIFTH CAUSE OF ACTION
## (NORTH CAROLINA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### N.C. Gen. Stat. Ann. § 78A-56(a)
### (Kyber Network)

684.     Plaintiff realleges the allegations above.

685.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in North Carolina.

686.     The North Carolina Securities Act forbids the offer or sale of unregistered securities. N.C. Gen. Stat. Ann. § 78A-24. Any person who offers or sells a security in violation of Section 24 is "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." *Id.* §§ 78A-56(a)(1)–(2).

687.     When issued, the KNC tokens were securities within the meaning of the North Carolina Securities Act. *Id.* §78A-2(11). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in North Carolina. The KNC tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act. *Id.* § 78A-24.

688.     On information and belief, the KNC tokens were offered or sold in North Carolina, including without limitation through solicitations directed by Kyber Network to North Carolina and received in North Carolina.

689.     Accordingly, Kyber Network has violated the North Carolina Securities Act through Kyber Network's sale of unregistered securities.

690.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

691.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-SIXTH CAUSE OF ACTION
### (NORTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**N.C. Gen. Stat. Ann. § 78A-56(c)**
**(Luu, Tran, and Velner)**

692.     Plaintiff realleges the allegations above.

693.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in North Carolina.

694.     Every person who directly or indirectly controls an entity liable under the North Carolina Securities Act for unlawfully offering or selling unregistered securities, as well as every "partner, officer, or director of the person," "every person occupying a similar status or performing similar functions," as well as "every dealer or salesman who materially aids in the sale" is jointly and severally liable with and to the same extent as the person, unless "able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* §§ 78A-56(c)(1).

695.     When issued, the KNC tokens were securities within the meaning of the North Carolina Securities Act. *Id.* §78A-2 (11). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in North Carolina. The KNC tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act.

696.    On information and belief, Kyber Network offered and sold the KNC tokens in North Carolina, including without limitation through solicitations directed by Kyber Network to North Carolina and received in North Carolina.

697.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

698.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the North Carolina Securities Act through Kyber Network's offer or sale of unregistered securities.

699.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

700.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-SEVENTH CAUSE OF ACTION
### (NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### N.D.C.C. §10-04-17
### (Kyber Network)

701.    Plaintiff realleges the allegations above.

702.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in North Dakota.

703.    The North Dakota Securities Act forbids the offer or sale of unregistered securities. N.D.C.C. §10-04-04. Any person who unlawfully contracts to sell or sells an unregistered security is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller, in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." *Id.* § 10-04-17(1).

704.    When issued, the KNC tokens were securities within the meaning of the North Dakota Securities Act. *Id.* §10-04-02 (19). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in North Dakota. The KNC tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act. *Id.* § 10-04-04.

705.    On information and belief, the KNC tokens were offered or sold in North Dakota, including without limitation through solicitations directed by Kyber Network to North Dakota and received in North Dakota.

706.    Accordingly, Kyber Network has violated the North Dakota Securities Act through Kyber Network's sale of unregistered securities.

707.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

708.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SIXTY-EIGHTH CAUSE OF ACTION
## <u>(NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)</u>

### Control Person Liability
### N.D.C.C. §10-04-17
### (Luu, Tran, and Velner)

709.    Plaintiff realleges the allegations above.

710.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in North Dakota.

711.    Every person who directly or indirectly controls a seller liable under the North Dakota Securities Act for unlawfully selling unregistered securities, as well as well as any person who "supervises, or serves as an officer, director, or managing partner of a person liable under this section," an individual "who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability," as well as every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless that person or individual "did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." N.D.C.C. §10-04-17(6).

712.    When issued, the KNC tokens were securities within the meaning of the North Dakota Securities Act. *Id.* §10-04-02 (19). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in North Dakota. The KNC tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act.

713.    On information and belief, Kyber Network offered and sold the KNC tokens in North Dakota, including without limitation through solicitations directed by Kyber Network to North Dakota and received in North Dakota.

714.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

715.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the North Dakota Securities Act through Kyber Network's offer or sale of unregistered securities.

716.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

717.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SIXTY-NINTH CAUSE OF ACTION
### (OHIO STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Ohio Rev. Code Ann. § 1707.43**
**(Kyber Network)**

718.    Plaintiff realleges the allegations above.

719.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Ohio.

720.     The Ohio Securities Act forbids the sale of unregistered securities. Ohio Rev. Code Ann. § 1707.09 (A)(1). Any person who sells a security in violation of Section 9(A)(1) is liable to the purchaser "in an action at law in any court of competent jurisdiction" for "the full amount paid by the purchaser and for all taxable costs." *Id.* § 1707.43(A).

721.     When issued, the KNC tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Ohio. The KNC tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act. *Id.* § 1707.09.

722.     On information and belief, the KNC tokens were sold in Ohio, including without limitation through solicitations directed by Kyber Network to Ohio and received in Ohio.

723.     Accordingly, Kyber Network has violated the Ohio Securities Act through Kyber Network's sale of unregistered securities.

724.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

725.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTIETH CAUSE OF ACTION
### (OHIO STATE LAW – ADDITIONAL LIABILITY)

**Joint and Several Liability**
**Ohio Rev. Code Ann. § 1707.43**
**(Luu, Tran, and Velner)**

726.     Plaintiff realleges the allegations above.

727.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Ohio.

728.    Every person that has "participated in or aided the seller in any way in making" the sale or contract for sale, are "jointly and severally liable" to the purchaser. Ohio Rev. Code Ann. § 1707.43.

729.    When issued, the KNC tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Ohio. The KNC tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act, and Kyber Network was not registered or exempt from registration as a dealer under Ohio law. *Id.* §§ 1707.09, 1707.14.

730.    On information and belief, Kyber Network sold the KNC tokens in Ohio, including without limitation through solicitations directed by Kyber Network to Ohio and received in Ohio.

731.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

732.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Ohio Securities Act through Kyber Network's sale of unregistered securities.

733.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

734.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTY-FIRST CAUSE OF ACTION
## (OKLAHOMA STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Okla. Sta. Ann. tit. 71§ 1-509(C)
### (Kyber Network)

735.     Plaintiff realleges the allegations above.

736.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Oklahoma.

737.     The Oklahoma Securities Act forbids the offer or sale of unregistered securities. Okla. Sta. Ann. tit. 71 § 1-301. Any person who offers or sells a security in violation of Section 301 is liable to the "purchaser may maintain an action at law or in equity to recover the consideration paid for the security, and interest at the legal rate of interest per year from the date of the purchase, less the amount of any income received on the security, plus costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" "*Id.* §1-509 (B)(1).

738.     When issued, the KNC tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* §1-102 (32). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Oklahoma. The KNC tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act. *Id.* § 1-301.

739.     On information and belief, the KNC tokens were offered or sold in Oklahoma, including without limitation through solicitations directed by Kyber Network to Oklahoma and received in Oklahoma.

740.     Accordingly, Kyber Network has violated the Oklahoma Securities Act through Kyber Network's sale of unregistered securities.

741.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

742.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-SECOND CAUSE OF ACTION
### (OKLAHOMA  STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Okla. Sta. Ann. tit. 71§ 1-509 (G)**
**(Luu, Tran, and Velner)**

743.     Plaintiff realleges the allegations above.

744.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Oklahoma.

745.     Every person who directly or indirectly controls an entity liable under the Oklahoma Securities Act for unlawfully selling unregistered securities, as well as every "managing partner, executive officer, or director" of such seller, "including an individual having similar status or performing similar functions," every employee of or associated with such a seller who materially aids in the sale" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Okla. Sta. Ann. tit. 71§ 1-509(G).

746.     When issued, the KNC tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* §1-102. On information and belief, Kyber Network offered and sold the KNC

tokens to members of the Class in Oklahoma. The KNC tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act.

747.   On information and belief, Kyber Network offered and sold the KNC tokens in Oklahoma, including without limitation through solicitations directed by Kyber Network to Oklahoma and received in Oklahoma.

748.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

749.   Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Oklahoma Securities Act through Kyber Network's offer or sale of unregistered securities.

750.   Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

751.   Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### SEVENTY-THIRD CAUSE OF ACTION
### (OREGON STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**O.R.S. § 59:115**
**(Kyber Network)**

752.   Plaintiff realleges the allegations above.

753.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Oregon.

754.    The Oregon Securities Act forbids the offer or sale of unregistered securities. O.R.S. § 59:055. Any person who offers or sells a security in violation of Section 55 "is liable to the purchaser," who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." *Id.* §§ 59.115 (2)(a)-(b).

755.    When issued, the KNC tokens were securities within the meaning of the Oregon Securities Act. *Id.* §59.015 (19). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Oregon. The KNC tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act. *Id.* § 59.055.

756.    On information and belief, the KNC tokens were offered or sold in Oregon, including without limitation through solicitations directed by Kyber Network to Oregon and received in Oregon.

757.    Accordingly, Kyber Network has violated the Oregon Securities Act through Kyber Network's sale of unregistered securities.

758.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

759.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTY-FOURTH CAUSE OF ACTION
## (OREGON STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### O.R.S. § 59:115 (3)
### (Luu, Tran, and Velner)

760.    Plaintiff realleges the allegations above.

761.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Oregon.

762.    Every person who directly or indirectly controls an entity liable under the Oregon Securities Act for unlawfully selling unregistered securities, as well as every "partner, limited liability company manager, including a member who is a manager, officer or director of such seller", "every person occupying a similar status or performing similar functions," and "every person who participated or materially aids in the sale" is liable for unlawfully selling unregistered securities, unless that nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care could not have known, of the existence of facts on which the liability is based." O.R.S. § 59:115 (3).

763.    When issued, the KNC tokens were securities within the meaning of the Oregon Securities Act. *Id.* § O.R.S.§ 59.015 (19). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Oregon. The KNC tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act.

764.    On information and belief, Kyber Network offered and sold the KNC tokens in Oregon, including without limitation through solicitations directed by Kyber Network to Oregon and received in Oregon.

765.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged

herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

766.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Oregon Securities Act through Kyber Network's offer or sale of unregistered securities.

767.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

768.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-FIFTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**70 Pa. Stat. Ann. § 1-502**
**(Kyber Network)**

769.    Plaintiff realleges the allegations above.

770.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Pennsylvania.

771.    The Pennsylvania Securities Act forbids the offer or sale of unregistered securities. 70 Pa. Stat. Ann. § 1-201. Any person who offers or sells a security in violation of Section 1-201 is "liable to the person purchasing the security offered or sold in violation of section 201 from him who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or

distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-502.

772.    When issued, the KNC tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Pennsylvania. The KNC tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act. *Id.* § 1-202.

773.    On information and belief, the KNC tokens were offered or sold in Pennsylvania, including without limitation through solicitations directed by Kyber Network to Pennsylvania and received in Pennsylvania.

774.    Accordingly, Kyber Network has violated the Pennsylvania Securities Act through Kyber Network's sale of unregistered securities.

775.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

776.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## SEVENTY-SIXTH CAUSE OF ACTION
## (PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### 70 Pa. Stat. Ann. § 1-503
### (Luu, Tran, and Velner)

777.    Plaintiff realleges the allegations above.

778.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Pennsylvania.

779.    Every affiliate of an entity liable under the Pennsylvania Securities Act for unlawfully selling unregistered securities, as well as every "partner, principal executive officer or director of such person" and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. 70 Pa. Stat. Ann. § 1-503(a).

780.    When issued, the KNC tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102. On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Pennsylvania. The KNC tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act, *id.* § 1-202.

781.    On information and belief, Kyber Network offered and sold the KNC tokens in Pennsylvania, including without limitation through solicitations directed by Kyber Network to Pennsylvania and received in Pennsylvania.

782.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

783.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Pennsylvania Securities Act through Kyber Network's offer or sale of unregistered securities.

784.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

785.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-SEVENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**10 L.P.R.A. § 890**
**(Kyber Network)**

786.    Plaintiff realleges the allegations above.

787.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Puerto Rico.

788.    The Puerto Rico Securities Act forbids the offer or sale of unregistered securities. 10 L.P.R.A. § 871. Any person who offers or sells a security in violation of Section 871 is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

789.    When issued, the KNC tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. On information and belief, Kyber Network offered or sold the KNC

tokens to members of the Class in Puerto Rico. The KNC tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act. *Id.* § 882.

790.    On information and belief, the KNC tokens were offered or sold in Puerto Rico, including without limitation through solicitations directed by Kyber Network to Puerto Rico and received in Puerto Rico.

791.    Accordingly, Kyber Network has violated the Puerto Rico Securities Act through Kyber Network's sale of unregistered securities.

792.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

793.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-EIGHTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**10 L.P.R.A. § 890**
**(Luu, Tran, and Velner)**

794.    Plaintiff realleges the allegations above.

795.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Puerto Rico.

796.    Every person who directly or indirectly controls an entity liable under the Puerto Rico Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a seller," and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care

could not have known, of the existence of the facts by reason of which liability is alleged to exist. 10 L.P.R.A. § 890(b).

797.     When issued, the KNC tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Puerto Rico. The KNC tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act.

798.     On information and belief, Kyber Network offered and sold the KNC tokens in Puerto Rico, including without limitation through solicitations directed by Kyber Network to Puerto Rico and received in Puerto Rico.

799.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

800.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Puerto Rico Securities Act through Kyber Network's offer or sale of unregistered securities.

801.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

802.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**SEVENTY-NINTH CAUSE OF ACTION**
**(RHODE ISLAND STATE LAW – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**7 R.I. Gen. Laws Ann. § 7-11-605**
**(Kyber Network)**

803.    Plaintiff realleges the allegations above.

804.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Rhode Island.

805.    The Rhode Island Securities Act forbids the offer or sale of unregistered securities. 7 R.I. Gen. Laws Ann. § 7-11-301. Any person who offers or sells a security in violation of Section 7-11-301 is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605.

806.    When issued, the KNC tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Rhode Island. The KNC tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act. *Id.* § 7-11-401.

807.    On information and belief, the KNC tokens were offered or sold in Rhode Island, including without limitation through solicitations directed by Kyber Network to Rhode Island and received in Rhode Island.

808.    Accordingly, Kyber Network has violated the Rhode Island Securities Act through Kyber Network's sale of unregistered securities.

809.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

810.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTIETH CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**R.I. Gen. Laws Ann. § 7-11-605(d)**
**(Luu, Tran, and Velner)**

811.    Plaintiff realleges the allegations above.

812.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Rhode Island.

813.    Every person who directly or indirectly controls an entity liable under the Rhode Island Securities Act for unlawfully selling unregistered securities, as well as "a partner, officer, or director of the person liable" and "a person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. R.I. Gen. Laws Ann. § 7-11-605(d).

814.    When issued, the KNC tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Rhode Island. The KNC tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act, *id.* § 7-11-401.

815.    On information and belief, Kyber Network offered and sold the KNC tokens in Rhode Island, including without limitation through solicitations directed by Kyber Network to Rhode Island and received in Rhode Island.

816.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

817.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Rhode Island Securities Act through Kyber Network's offer or sale of unregistered securities.

818.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

819.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTY-FIRST CAUSE OF ACTION
## (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### S.C. Code Ann. § 35-1-509
### (Kyber Network)

820.    Plaintiff realleges the allegations above.

821.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in South Carolina.

822.    The South Carolina Securities Act forbids the offer or sale of unregistered securities. S.C. Code Ann. § 35-1-301. Any person who sells a security in violation of Section 35-1-301 is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 35-1-509(b).

823.    When issued, the KNC tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Kyber Network sold the KNC tokens to members of the Class in South Carolina. The KNC tokens were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act. *Id.* § 35-1-201.

824.    On information and belief, the KNC tokens were sold in South Carolina, including without limitation through solicitations directed by Kyber Network to South Carolina and received in South Carolina.

825.     Accordingly, Kyber Network has violated the South Carolina Securities Act through Kyber Network's sale of unregistered securities.

826.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

827.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-SECOND CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)**

**Control Person Liability**
**S.C. Code Ann. § 31-1-509**
**(Luu, Tran, and Velner)**

828.     Plaintiff realleges the allegations above.

829.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in South Carolina.

830.     Every person who directly or indirectly controls an entity liable under the South Carolina Securities Act for unlawfully selling unregistered securities, as well as an individual "who is a managing partner, executive officer, or director of a person liable, … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. S.C. Code. Ann. § 31-1-509(g).

831.     When issued, the KNC tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Kyber Network sold the KNC tokens to members of the Class in South Carolina. The KNC tokens were neither registered

159

under, nor subject to exemption from registration under the South Carolina Securities Act, *id.* § 35-1-201.

832.    On information and belief, Kyber Network sold the KNC tokens in South Carolina, including without limitation through solicitations directed by Kyber Network to South Carolina and received in South Carolina.

833.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

834.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the South Carolina Securities Act through Kyber Network's sale of unregistered securities.

835.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

836.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**EIGHTY-THIRD CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)**

**Sale of Unregistered Securities**
**S.D. Codified Laws § 47-31B-509(b)**
**(Kyber Network)**

837.    Plaintiff realleges the allegations above.

838.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in South Dakota.

839.    The South Dakota Securities Act forbids the sale of unregistered securities. S.D. Codified Laws § 47-31B-301. Any person who sells a security in violation of Section 47-31B-301 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b).

840.    When issued, the KNC tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in South Dakota. The KNC tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act. *Id.* §§ 47-31B-201-47-31B-203.

841.    On information and belief, the KNC tokens were sold in South Dakota, including without limitation through solicitations directed by Kyber Network to South Dakota and received in South Dakota.

842.    Accordingly, Kyber Network has violated the South Dakota Securities Act through Kyber Network's sale of unregistered securities.

843.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

844.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTY-FOURTH CAUSE OF ACTION
## (SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### S.D. Codified Laws § 47-31B-509
### (Luu, Tran, and Velner)

845.    Plaintiff realleges the allegations above.

846.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in South Dakota.

847.    Every person who directly or indirectly controls an entity liable under the South Dakota Securities Act for unlawfully selling unregistered securities, as well as an "individual who is a managing partner, executive officer, or director … employee of or associated with" an entity so liable is "liable jointly and severally with and to the same extent as" such a person. S.D. Codified Laws § 47-31B-509.

848.    When issued, the KNC tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Kyber Network sold the KNC tokens to members of the Class in South Dakota. The KNC tokens were not registered under, nor subject to exemption from registration under the South Dakota Securities Act. *Id.* §§ 47-31B-301, 47-31B-401(a).

849.    On information and belief, Kyber Network sold the KNC tokens in South Dakota, including without limitation through solicitations directed by Kyber Network to South Dakota and received in South Dakota.

850.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to

engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

851.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the South Dakota Securities Act through Kyber Network's sale of unregistered securities.

852.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

853.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-FIFTH CAUSE OF ACTION
### (TENNESSEE STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Tenn. Code Ann. § 48-1-122**
**(Kyber Network)**

854.    Plaintiff realleges the allegations above.

855.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Tennessee.

856.    The Tennessee Securities Act forbids the sale of unregistered securities. Tenn. Code Ann. § 48-1-104(a). Any person who sells a security in violation of Section 104(a) is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when

the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

857.    When issued, the KNC tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Tennessee. The KNC tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act. *Id.* § 48-1-103.

858.    On information and belief, the KNC tokens were sold in Tennessee, including without limitation through solicitations directed by Kyber Network to Tennessee and received in Tennessee.

859.    Accordingly, Kyber Network has violated the Tennessee Securities Act through Kyber Network's sale of unregistered securities.

860.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

861.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-SIXTH CAUSE OF ACTION
### (TENNESSEE STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Tenn. Code Ann. § 48-1-122(g)**
**(Luu, Tran, and Velner)**

862.    Plaintiff realleges the allegations above.

863.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Tennessee.

864.    Every person who directly or indirectly controls an entity liable under the Tennessee Securities Act for unlawfully selling unregistered securities, as well as "every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation" is "liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 48-1-122(g).

865.    When issued, the KNC tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Tennessee. The KNC tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act.

866.    On information and belief, Kyber Network sold the KNC tokens in Tennessee, including without limitation through solicitations directed by Kyber Network to Tennessee and received in Tennessee.

867.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

868.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Tennessee Securities Act through Kyber Network's sale of unregistered securities.

869.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

870.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-SEVENTH CAUSE OF ACTION
### (TEXAS STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**Texas Civ. St. Art. § 581-33 A**
**(Kyber Network)**

871.     Plaintiff realleges the allegations above.

872.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Texas.

873.     The Texas Blue Sky Law – Securities forbids the offer or sale of unregistered securities. Texas Civ. St. Art. § 581-7. Any person who offers or sells a security in violation of Section 581-7 is "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer

disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

874.     When issued, the KNC tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A.  On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Texas.  The KNC tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities. *Id.* § 581-6.

875.     On information and belief, the KNC tokens were offered or sold in Texas, including without limitation through solicitations directed by Kyber Network to Texas and received in Texas.

876.     Accordingly, Kyber Network has violated the Texas Blue Sky Law – Securities through Kyber Network's sale of unregistered securities.

877.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

878.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## EIGHTY-EIGHTH CAUSE OF ACTION
## (TEXAS STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### Texas Civ. St. Art. § 581-33 F
### (Luu, Tran, and Velner)

879.     Plaintiff realleges the allegations above.

880.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Texas.

881.    Every person who directly or indirectly controls an entity liable under the Texas Blue Sky Law – Securities for unlawfully selling unregistered securities is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Texas Civ. St. Art. § 581-33 F.

882.    When issued, the KNC tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A.  On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Texas. *Id.* §§ 581-4 C, 581-4 D. The KNC tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities.

883.    On information and belief, Kyber Network offered and sold the KNC tokens in Texas, including without limitation through solicitations directed by Kyber Network to Texas and received in Texas.

884.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered as described herein.

885.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Texas Blue Sky Law – Securities through Kyber Network's offer or sale of unregistered securities.

886.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

887.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### EIGHTY-NINTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer and Sale of Securities**
**Utah Code §61-1-22**
**(Kyber Network)**

888.    Plaintiff realleges the allegations above.

889.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Utah.

890.    The Utah Securities Act forbids the offer or sale of unregistered securities. Utah Code Ann. § 61-1-7. Any person who offers or sells a security in violation of Section 61-1-7 is liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

891.    When issued, the KNC tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Utah. The KNC tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act. *Id.* § 61-14.

892.    On information and belief, the KNC tokens were offered or sold in Utah, including without limitation through solicitations directed by Kyber Network to Utah and received in Utah.

893.     Accordingly, Kyber Network has violated the Utah Securities Act through Kyber Network's sale of unregistered securities.

894.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

895.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETIETH CAUSE OF ACTION
### (UTAH STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Utah Code Ann. § 61-1-22.**
**(Luu, Tran, and Velner)**

896.     Plaintiff realleges the allegations above.

897.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Utah.

898.     Every person who directly or indirectly controls an entity liable under the Utah Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase" are liable jointly and severally "with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Utah Code Ann. § 61-1-22.

899.    When issued, the KNC tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Utah. The KNC tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act.

900.    On information and belief, Kyber Network offered and sold the KNC tokens in Utah, including without limitation through solicitations directed by Kyber Network to Utah and received in Utah.

901.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

902.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Utah Securities Act through Kyber Network's offer or sale of unregistered securities.

903.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

904.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-FIRST CAUSE OF ACTION
## (VERMONT STATE LAW – PRIMARY LIABILITY)

### Unregistered Offer and Sale of Securities
### Vt. Stat. Ann. tit. 9, § 5509
### (Kyber Network)

905.    Plaintiff realleges the allegations above.

906.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Vermont.

907.    The Vermont Securities Act forbids the offer or sale of unregistered securities. Vt. Stat. Ann. tit. 9, § 5309. Any person who offers or sells a security in violation of Section 5309 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509.

908.    When issued, the KNC tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Vermont. The KNC tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act. *Id.* §§ 5201-5203.

909.    On information and belief, the KNC tokens were offered or sold in Vermont, including without limitation through solicitations directed by Kyber Network to Vermont and received in Vermont.

910.    Accordingly, Kyber Network has violated the Vermont Securities Act through Kyber Network's sale of unregistered securities.

911.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

912.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-SECOND CAUSE OF ACTION
## (VERMONT STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Luu, Tran, and Velner)**

913.    Plaintiff realleges the allegations above.

914.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Vermont.

915.    Every person who directly or indirectly controls an entity liable under the Vermont Securities Act for unlawfully selling unregistered securities, as well as "an individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions," is jointly and severally liable with the entity "unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Vt. Stat. Ann. tit. 9, § 5509(g).

916.    When issued, the KNC tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Vermont. The KNC tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act.

917.    On information and belief, Kyber Network offered and sold the KNC tokens in Vermont, including without limitation through solicitations directed by Kyber Network to Vermont and received in Vermont.

918.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

919.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Vermont Securities Act through Kyber Network's offer or sale of unregistered securities.

920.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

921.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-THIRD CAUSE OF ACTION
### (VIRGINIA STATE LAW – PRIMARY LIABILITY)

**Unregistered Sale of Securities**
**Va. Code Ann. § 13.1-522 A**
**(Kyber Network)**

922.    Plaintiff realleges the allegations above.

923.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

924.    The Virginia Securities Act forbids the offer or sale of unregistered securities. Va.

Code Ann. § 13.1-507. Any person who sells a security in violation of Section 13.1-507 "shall be

liable to the person purchasing such security from him who may sue either at law or in equity to

recover the consideration paid for such security, together with interest thereon at the annual rate

of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on

the security, upon the tender of such security, or for the substantial equivalent in damages if he no

longer owns the security." *Id.* § 13.1-522 A.

925.    When issued, the KNC tokens were securities within the meaning of the Virginia

Securities Act. *Id.* § 13.1-501 A. On information and belief, Kyber Network sold the KNC tokens

to members of the Class in Virginia. The KNC tokens were neither registered under, nor subject

to exemption from registration under the Virginia Securities Act. *Id.* § 13.1-514 A.

926.    On information and belief, the KNC tokens were sold in Virginia, including without

limitation through solicitations directed by Kyber Network to Virginia and received in Virginia.

927.    Accordingly, Kyber Network has violated the Virginia Securities Act through

Kyber Network's sale of unregistered securities.

928.    Class members who own the KNC tokens have made or will make any necessary

tender and seek all remedies available at law or in equity for any KNC tokens purchased in the

Class Period, including any applicable costs, attorneys' fees, and interest.

929.    Class members who no longer own the KNC tokens seek damages for any KNC

tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## NINETY-FOURTH CAUSE OF ACTION
## (VIRGINIA STATE LAW – ADDITIONAL LIABILITY)

### Control Person Liability
### Va. Code Ann. § 13.1-522 C
### (Luu, Tran, and Velner)

930.    Plaintiff realleges the allegations above.

931.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Virginia.

932.    Every person who directly or indirectly controls an entity liable under the Virginia Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Va. Code Ann. § 13.1-522 C.

933.    When issued, the KNC tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Kyber Network sold the KNC tokens to members of the Class in Virginia. The KNC tokens were not registered under, nor subject to exemption from registration under the Virginia Securities Act.

934.    On information and belief, Kyber Network sold the KNC tokens in Virginia, including without limitation through solicitations directed by Kyber Network to Virginia and received in Virginia.

935.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

936.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Virginia Securities Act through Kyber Network's sale of unregistered securities.

937.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

938.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-FIFTH CAUSE OF ACTION**
**(WASHINGTON STATE LAW – PRIMARY LIABILITY)**

**Unregistered Offer and Sale of Securities**
**Wash. Rev. Code § 21.20.430(1)**
**(Kyber Network)**

939.    Plaintiff realleges the allegations above.

940.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Washington.

941.    The Securities Act of Washington forbids the offer or sale of unregistered securities. Wash. Rev. Code § 21.20.140. Any person who offers or sells a security in violation of Section 21.20.140 is "liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount

of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. " *Id.* § 21.20.430(1).

942.    When issued, the KNC tokens were securities within the meaning of the Securities Act of Washington. *Id.* § 21.20.005(17). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Washington. The KNC tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Washington. *Id.* § 21.20.310.

943.    On information and belief, the KNC tokens were offered or sold in Washington, including without limitation through solicitations directed by Kyber Network to Washington and received in Washington.

944.    Accordingly, Kyber Network has violated the Securities Act of Washington through Kyber Network's sale of unregistered securities.

945.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

946.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-SIXTH CAUSE OF ACTION
### (WASHINGTON STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Wash. Rev. Code Ann. § 21.20.430**
**(Luu, Tran, and Velner)**

947.    Plaintiff realleges the allegations above.

948.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Washington.

949.     Every person who directly or indirectly controls an entity liable under the Securities Act of Washington for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 21.20.430(3).

950.     When issued, the KNC tokens were securities within the meaning of the Securities act of Washington. *Id.* § 21.20.005(17). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in Washington. The KNC tokens were not registered under, nor subject to exemption from registration under the Securities act of Washington.

951.     On information and belief, Kyber Network offered and sold the KNC tokens in Washington, including without limitation through solicitations directed by Kyber Network to Washington and received in Washington.

952.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

953.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Securities Act of Washington through Kyber Network's offer or sale of unregistered securities.

954.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

955.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**NINETY-SEVENTH CAUSE OF ACTION**
**(WISCONSIN STATE LAW – PRIMARY LIABILITY)**

**Unregistered Sale of Securities**
**Wis. Stat. § 551.509**
**(Kyber Network)**

956.    Plaintiff realleges the allegations above.

957.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in the State of Wisconsin.

958.    The Wisconsin Uniform Securities Law forbids the sale of unregistered securities. Wis. Stat. § 551.301. Any person who sells a security in violation of Section 301 is liable to the purchaser for the "consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court." *Id.* § 551.509(2)(c).

959.    When issued, the KNC tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). Kyber Network sold the KNC tokens to members of

the Class in the State of Wisconsin. The KNC tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law. *Id.* § 551.301.

960.    On information and belief, the KNC tokens were offered or sold in the State of Wisconsin, including without limitation through solicitations directed by Kyber Network to the State of Wisconsin and received in the State of Wisconsin.

961.    Accordingly, Kyber Network has violated the Wisconsin Uniform Securities Law through Kyber Network's sale of unregistered securities.

962.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

963.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-EIGHTH CAUSE OF ACTION
### (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Wis. Stat. Ann. § 551.509**
**(Luu, Tran, and Velner)**

964.    Plaintiff realleges the allegations above.

965.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in the State of Wisconsin.

966.    Every person who directly or indirectly controls an entity liable under the Wisconsin Uniform Securities Law for unlawfully selling unregistered securities , as well as "managing partner, executive officer, or director of a person liable under subs. (2) to (6), including an individual having a similar status or performing similar functions," is jointly and severally liable "unless the individual sustains the burden of proof that the individual did not know, and in the

exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Wis. Stat. Ann. § 551.509(7)(d).

967.    When issued, the KNC tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). Kyber Network sold the KNC tokens to members of the Class in the State of Wisconsin. The KNC tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law, and Kyber Network was not registered or exempt from registration under Wisconsin law. *Id.* §§ 551.301, 551.401(1), 551.402(1).

968.    Kyber Network sold the KNC tokens in the State of Wisconsin, including without limitation through solicitations directed by Kyber Network to the State of Wisconsin and received in the State of Wisconsin.

969.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered as described herein.

970.    Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Wisconsin Uniform Securities Law through Kyber Network's sale of unregistered securities.

971.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

972.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### NINETY-NINTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)

**Unregistered Offer or Sale of Securities**
**W. Va. Code Ann. § 32-4-410(a)**
**(Kyber Network)**

973.     Plaintiff realleges the allegations above.

974.     This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in West Virginia.

975.     The West Virginia Uniform Securities Act forbids the offer or sale of unregistered securities. W. Va. Code Ann. § 32-3-301. Any person who offers or sells a security in violation of Section 32-3-301 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

976.     When issued, the KNC tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in West Virginia. The KNC tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act. *Id.* § 32-4-402.

977.   On information and belief, the KNC tokens were offered or sold in West Virginia, including without limitation through solicitations directed by Kyber Network to West Virginia and received in West Virginia.

978.   Accordingly, Kyber Network has violated the West Virginia Uniform Securities Act through Kyber Network's sale of unregistered securities.

979.   Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

980.   Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDREDTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**W. Va. Code Ann. § 32-4-410**
**(Luu, Tran, and Velner)**

981.   Plaintiff realleges the allegations above.

982.   This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in West Virginia.

983.   Every person who directly or indirectly controls an entity liable under the West Virginia Uniform Securities Act for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 32-4-410(b).

984.     When issued, the KNC tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Kyber Network offered and sold the KNC tokens to members of the Class in West Virginia. The KNC tokens were not registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act.

985.     On information and belief, Kyber Network offered and sold the KNC tokens in West Virginia, including without limitation through solicitations directed by Kyber Network to West Virginia and received in West Virginia.

986.     Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities as described herein.

987.     Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the West Virginia Uniform Securities Act through Kyber Network's offer or sale of unregistered securities.

988.     Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

989.     Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE HUNDRED AND FIRST CAUSE OF ACTION
## (WYOMING STATE LAW – PRIMARY LIABILITY)

### Unregistered Sale of Securities
### Wyo. Stat. Ann. § 17-4-509(b)
### (Kyber Network)

990.    Plaintiff realleges the allegations above.

991.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were sold in Wyoming.

992.    The Wyoming Uniform Securities Act forbids the offer or sale of unregistered securities. Wyo. Stat. Ann. § 17-4-301. Any person who sells a security in violation of Section 17-4-301 is liable to the purchaser, who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *Id.* § 17-4-509(b)(i). If the purchaser no longer owns the security, then he may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(b)(iii).

993.    When issued, the KNC tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Kyber Network offered or sold the KNC tokens to members of the Class in Wyoming. The KNC tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act. *Id.* § 17-4-201 - 204.

994.    On information and belief, the KNC tokens were offered or sold in Wyoming, including without limitation through solicitations directed by Kyber Network to Wyoming and received in Wyoming.

995.    Accordingly, Kyber Network has violated the Wyoming Uniform Securities Act through Kyber Network's sale of unregistered securities.

996.    Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

997.    Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE HUNDRED AND SECOND CAUSE OF ACTION
### (WYOMING STATE LAW – ADDITIONAL LIABILITY)

**Control Person Liability**
**Wyo. Stat. Ann. § 17-4-509(g)**
**(Luu, Tran, and Velner)**

998.    Plaintiff realleges the allegations above.

999.    This Cause of Action is brought on behalf of Class members to whom KNC tokens were offered or sold in Wyoming.

1000.   Every person who directly or indirectly controls a person liable under the Wyoming Uniform Securities Act for unlawfully selling unregistered securities, as well as every managing partner, executive officer, or director of such a seller, including every person having a similar status or performing similar functions … is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. *Id.* §§ 17-4-509(g)(i) – (iv).

1001. When issued, the KNC tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Kyber Network sold the KNC tokens to members of the Class in Wyoming. The KNC tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act.

1002. On information and belief, Kyber Network sold the KNC tokens in Wyoming, including without limitation through solicitations directed by Kyber Network to Wyoming and received in Wyoming.

1003. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Kyber Network and its employees, and to cause Kyber Network to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities as described herein.

1004. Accordingly, the Individual Defendants, who directly or indirectly controlled Kyber Network, have violated the Wyoming Uniform Securities Act through Kyber Network's sale of unregistered securities.

1005. Class members who own the KNC tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1006. Class members who no longer own the KNC tokens seek damages for any KNC tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## **PRAYER FOR RELIEF**

1007. On behalf of himself and the Class, Plaintiff requests relief as follows:

a.  That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b.  That the Court enter an order declaring that Defendants' actions, as set forth in this Amended Complaint, violate the federal and state laws set forth above;

c.  That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

d.  That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled;

e.  That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

f.  That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

g.  That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

1008.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all claims.

Dated:        September 11, 2020
              New York, New York

                              Respectfully submitted,

/s/ Philippe Z. Selendy              /s/ Kyle W. Roche
Philippe Z. Selendy                  Kyle W. Roche
Jordan A. Goldstein                  Edward Normand
David Coon                           Velvel (Devin) Freedman
Michelle Foxman                      Joseph M. Delich
SELENDY & GAY, PLLC                  ROCHE CYRULNIK
1290 Sixth Avenue, 17th                 FREEDMAN LLP
Floor                                99 Park Avenue, 19th Floor
New York, NY 10104                   New York, NY 10016
pselendy@selendygay.com              kyle@rcfllp.com
jgoldstein@selendygay.com            tnormand@rcfllp.com
dcoon@selendygay.com                 vel@rcfllp.com
mfoxman@selendygay.com               jdelich@rcfllp.com